**Reginald Edison WRIGHT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 39803.**

Court of Criminal Appeals of Texas.

July 26, 1967.

Rehearing Denied Oct. 25, 1967.

Second Rehearing Denied Nov. 29, 1967.

Jack Beech (Court Appointed on Appeal Only), Fort Worth, Alfred J. Jackson, Jr. (Court Appointed), Fort Worth, for appellant.

Frank Coffey, Dist. Atty., Glenn Goodnight, Grady Hight and Walter Shore, Asst. Dist. Attys., Fort Worth, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The appellant was convicted of murder upon an indictment alleging that he did "voluntarily and with malice aforethought kill Ralph Lucas Bennett by stomping him with his feet," and his punishment was assessed at death.

The sufficiency of the evidence to support the conviction is challenged. It is insisted that the evidence is insufficient to establish the corpus delicti, and that there is no evidence that the death of the deceased was caused by any criminal act or agency of the appellant.

In order to establish the corpus delicti in cases of homicide, there must be shown a criminal act and the resulting death, and the agency of the accused in its commission.

The testimony reveals that Raymond Moore Davidson, Ralph Bennett, and the appellant lived in separate apartments in the same apartment house. Davidson testified that on July 4, 1965, he went into Bennett's apartment, made some coffee, and Bennett came in, sat on the bed, then appellant came in, slapped Bennett on the face, causing his nose to bleed, and accused Bennett of stealing a $104 check from him; that about 2 or 3 p. m., he heard an unusual racket and on going to appellant's apartment door he saw the appellant upon Bennett, who was lying on his back on the floor, and appellant was jumping up and down on Bennett's stomach with both feet, and when he threatened to call the police appellant sat down, and soon said he would give Bennett some air by taking him for a ride around the park; that he helped put Bennett in appellant's car and last saw them about 3:30 or 4:30 p. m.

The evidence further reveals that about 4 p. m., July 4, a body was found in Trinity Park with a check stub bearing the name of "R. L. Bennett" in one of the pockets of the clothing on the body. The body was bruised with blood on the face and chest, and the body was warm.

Dr. Gwozdz, the pathologist who performed the autopsy, testified in addition to the numerous lacerations on the body and that both sides of ribs could be lifted from the sternal bone without dissection, that:

"A  The cause of death is considered an acute shock, due to multiple internal hemmorrhages, as the result of injuries to the chest, present with multiple fractures of the ribs, with hemorrhages into the chest, as well as into the abdominal cavity, and with traumatic rupture of the liver and lungs."

The appellant contends that the evidence is insufficient to show that the death of the deceased was caused by a criminal act. As grounds for this contention he urges that the body was found only six feet from a roadway; that tire marks were near the body; that a policeman was investigating

an automobile in a ditch 61 feet from the body at the time it was discovered; that the body was warm, and the injuries looked like those caused by being struck by an automobile.

It is concluded that all the facts and circumstances in evidence were sufficient to authorize the jury to find that the death of the deceased was caused by violence unlawfully inflicted by someone.

■ As grounds for reversal, it is contended that there is no evidence that the name of the deceased was Ralph Lucas Bennett or that the appellant killed him by stomping him with his feet.

The evidence reveals that the appellant and Ralph Bennett lived in adjoining apartments, and on July 4, 1965, the appellant went into Bennett's apartment, slapped Bennett on the face, causing his nose to bleed, and said to Bennett, "You so-and-so, you stole my $104.00 check"; that later Bennett was seen lying on the floor in appellant's apartment, and appellant was jumping up and down on Bennett's stomach with both feet, and that the shoes which appellant had on at the trial looked like the same shoes he had then; that when threats were made to call the police, the appellant said he would give Bennett some air *by taking him for a ride around the park,* and the appellant left the apartment with Bennett in the car about 3:30 or 4:30 p. m.; that Bennett was wearing levis and a dark striped shirt with the two top buttons open when they left in the car; that about 4 p. m., July 4, 1965, *a body was found in Trinity Park* with a check stub bearing the name of "R. L. Bennett" on it in one of the pockets of the clothing on the body; that the body was bruised with blood on the face and chest, and the body was warm; and that the body was clothed with levis and a western shirt which was unbuttoned.

Officer Burkhart testified in part as follows:

"Q (State's Counsel) Officer Burkhart, briefly, just what are your duties with the Fort Worth Police Department?

"A I am a Member of the Crime Search Detail.

"Q And just tell us and the Jury what you do when you arrive at the scene of a crime.

"A Well, when I arrive at the scene of a crime, I take photos, whatever is necessary, collect all the evidence, mark and preserve finger-prints. Depends on what type of crime it is. But primarily, it is to collect all evidence, found at the scene of the crime.

"Q Is that what you did in this case?

"A Yes sir.

"Q Does that require special training?

"A They did send us to school, and train us for this particular job."

Officer Burkhart was later recalled as a witness by the state and testified in part as follows:

"Q Officer Burkhart, were you at the Greenwood Funeral Home when Mr. Taylor, the Identification Officer of the Fort Worth Police Department arrived?

"A Yes sir, I was.

"Q Were you present when he compared the fingerprints of the deceased with those of Ralph Lucas Bennett?

"A I was.

"Q Did they compare?

"A Yes sir.

"Q Was it the same man?

"A Yes sir.

"State's Counsel: That's all.

"Q (Appellant's Counsel) Was it Ralph Lucas Bennett or R. L. Bennett?

"A The prints that he brought from the Identification Bureau, were carried as Ralph Lucas Bennett.

"Q Well now, that is something you looked at and saw? * * * Correct?

"A Yes sir. This was on the card that Mr. Taylor the ID Man, brought.

"Appellant's Counsel: We object to all of this testimony, Your Honor, because it is not the best evidence, and it is hearsay.

"The Court: I overrule your objection."

No error is shown by the action of the court in overruling said objection as the appellant contends.

Detective Sinclair, who went to the apartment house described herein during the investigation of this case, testified:

"A I found the Defendant, Mr. Reginald Wright.

"Q Did you have any conversation with the Defendant at that time?

"A Yes sir.

"Q Did you ask him where he lived?

"A Yes sir.

"Q Where did he tell you that he lived?

"A He lived in Apartment 2, which he was standing in the door-way of, at that time.

"Q Did you ask him if you could go in?

"A He invited us, myself and Officer Coffman, in.

"Q All right. * * * *Did you ask him if he knew Ralph Lucas Bennett?*

"A *Yes sir.*

"Q *What did he tell you?*

"A *He told me that he did know Mister Bennett; * * * and that he had lived in Room 3, up until Saturday, July the 3rd; * * *.*"

Carl Maupin, chemist and toxicologist, who investigated room nos. 2 and 3 in the apartment house in question, testified as follows:

"A In Room 2, * * * I found two buttons on the floor. One was under the red carpet; the other was on top of the same red carpet.

* * * * * *

"Q Did you examine the buttons that you found there in that room?

"A Yes sir, I did.

"Q And did you make any comparison of those buttons with anything else?

"A Yes. I compared the buttons found, with the buttons on the shirt of the deceased.

"Q State whether or not there were any buttons missing from the shirt of the deceased?

"A Yes sir; there were two missing, from the shirt of the deceased.

"Q How many buttons did you find in Room 2?

"A I found two.

"Q What did your comparison reveal?

"A Let me find my notes here. * * * Now, the comparison showed that two buttons found on the floor, were similar in color, size, shape, thread, number of holes, size and color of thread found in the victim's shirt."

Officer Young, assigned to the Crime Scene Search Division, testified that on July 4, he investigated a body in Trinity Park, and that he took a specimen of hair from the body at the funeral home and put it in an envelope and then placed it in the evidence box at the city hall. Following the above testimony it was developed that Young did not accompany the body to the funeral home but was directed to the body by the people at the funeral home when he arrived. After such testimony, the appellant stated: "We object to that" which was overruled.

Chemist Maupin, who is in charge of the Crime Laboratory, was recalled and further testified:

"A Yes sir, I did. I compared the hair that I had taken out of the evidence box with the hair that I found on the floor.

"Q Did you actually take this out of the evidence box yourself?

"A Yes sir, I did.

"Q You opened it and took it out, yourself?

"A Yes sir; that's correct.

*     *     *     *     *     *

"Q All right. * * * State what you did with the sample of hair, Mr. Maupin?

"A I took the sample of hair, mounted it on a slide and examined it. And it was characteristic of human hair.

"Q Did you compare it with any other hair?

"A Yes, I compared it with hair from the deceased.

"Q All right. * * * And what is your opinion concerning that comparison?

"A The comparison showed that the hair found in Room 2, was similar to the hair from the deceased, in color and in texture."

The state called Mrs. Nelma Jeneva Banker, who testified in part:

"'About nine thirty or ten, nine-thirty a. m., or ten a. m., on July 4th, 1965, I went downstairs and outside to where our car was parked. I got some matches out of the car, and when I started back up to the room, at the foot of the stairs, I looked into the room located at the end of the hall, and saw Bennett laying on the floor. A man was sitting on the bed and *and* kicked Bennett between the shoulders with his foot.'"

The facts and circumstances surrounding the death of the deceased, when considered as a whole, are sufficient to warrant the jury's conclusion that the deceased's name was Ralph Lucas Bennett, and that the appellant caused his death as charged.

■ Error is urged on the ground that the trial court erred in permitting the state to impeach Banker, its own witness.

The state's witness Banker testified, that on leaving her apartment she saw a man she knew only as Bennett, lying on the floor in a room, and also saw a man who looked like the appellant sitting on the bed in the room.

Apparently, upon the failure of the witness Banker to testify as expected, the state's attorney exhibited a written statement to her which she admitted signing. He then read the following portion of said statement: "A man was sitting on the bed and *and* kicked Bennett between the shoulders with his foot." When said portion of the statement was read, Mrs. Banker was asked: "Is that what happened?" and she replied, "Yes, sir." In light of the admission by Mrs. Banker that the quoted part of her written statement correctly related the facts, the appellant's contention is overruled.

■ It is asserted as a ground of error that, the trial court erred in allowing the trial to proceed without first having a hearing to determine appellant's competency to stand trial on the merits.

There is no authenticated fact or circumstance appearing in the record which would direct the attention of the trial judge to or give him notice of any abnormal mental condition of the appellant at or during the trial which could affect his mental capacity to stand trial. According to the record no hearing was called for during the trial, and the ground asserted as error is overruled.

In Formal Bill of Exception No. Two the appellant complains of the state's attorney's conduct, during his argument to the jury following a verbal description of appellant's treatment of the deceased, when he repeatedly, in a loud and noisy manner, jumped for about two minutes upon a piece of paper he had thrown on the floor.

The qualification of the bill which the appellant accepted, recites that the state's attorney only jumped upon the paper three times, and that the court could not state what image the jury might have had; that the objection thereto was: "We object to this outrageous thing, and furthermore the evidence was that he was not on his chest, but that he was on his stomach"; and there was no request for an instruction to the jury to disregard such action.

In light of the record including the testimony shown by the summary herein of all the evidence in the case, no error is presented by the bill.

The judgment is affirmed.