274 So.2d 333

**Floyd E. HARNAGE, Jr.**

v.

**STATE.**

**7 Div. 74.**

Court of Criminal Appeals of Alabama.

June 13, 1972.

Rehearing Denied June 30, 1972.

For per curiam after remand, see 49 Ala.App. 751, 274 So.2d 356, certiorari denied, 290 Ala. ——, 274 So.2d 356.

James M. Campbell, Anniston, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted for the offense of murder in the first degree and his punishment fixed at life imprisonment in the penitentiary. He was charged with killing Linda Faye Croft by strangling her.

Linda Faye Croft was a student at the University and a student employee with the ROTC Unit where appellant worked. Linda Faye was last seen alive about 5:35 P. M. on Thursday, February 26, 1970, in company with appellant walking toward a parking lot behind Martin Hall on the campus of Jacksonville State University. One James Bartels, a Private in the U. S. Army and a student at Jacksonville State University, is the person who identified the appellant as the man Linda Faye was talking to at 5:30 P.M. on the sidewalk behind Martin Hall and then saw them walking toward the parking lot five minutes later. He made an in-court identification.

Linda Faye's body was found the following Sunday morning, March 1, down an embarkment on the Rocky Hollow Road, face down in a pile of trash and garbage, at a point about five and eight-tenths miles from the parking lot where she was last seen with appellant.

Linda Faye roomed with Miss Rita Morris in Curtis Hall on the campus. Miss Morris testified that on February 26, 1970, she was in their room studying for an examination she was to take the following day and that Linda Faye came to the room at fifteen minutes until five o'clock p. m. and changed clothes, as Linda was to meet a man at Martin Hall to learn where a surprise party was to be given for her fiance, Mike Whitlock, at which party he was to receive an award of some type. Rita could not remember the man's last name but testified it started with an "H" and that he did work at the ROTC Building with Linda Faye. In this conversation with Miss Morris, Linda Faye told her that they (she and appellant) had talked that day about a letter appellant had shown her about the award that Mike was to receive. Linda Faye was dressed in navy blue pants, a navy blue long sleeveless vest, a long-sleeved white blouse, and had on a beige raincoat and blue shoes. She also wore a chain necklace, a wrist watch and a diamond ring. As she was about to leave the room at fifteen minutes after five o'clock p. m., she opened her raincoat and said,

"See what I have got on, just in case anybody needs to know, just remember what I have got on."

She further told Rita she expected to be back at 6:30 P.M. as she had a date with Mike at seven o'clock p. m.; but, if she was not back by nine o'clock p. m., to call the police. Linda appeared nervous and according to Rita, she was teasing around with her and Linda said that if the man she was going to meet tried anything, she would give him a karate chop in the back because he had returned from Viet Nam not too long ago and that he had a bad back. In the early morning hours on Friday following Linda's disappearance on Thursday evening, Rita found a note in Linda's communications notebook which was offered in evidence as State's Exhibit No. 5 without objection. The note is as follows:

"Cathy,

I know this letter is silly but all day long I've had the weirdest feeling about

this party situation. For some reason I don't feel that there is a planning of a party. Don't ask me why but I've just got this funny feeling."

There was considerable testimony relating to an award vel non, but not one of the five other full-time employees nor two other student employees, nor even Colonel Wells, who was in charge of the ROTC office, had ever heard anything about an award of any kind, nature, or description for Mike Whitlock until the appellant mentioned to them at the Office on Friday, February 27, after Miss Croft's disappearance and very probably after her death, that the deceased had told him of the award, but said it was supposed to be a secret. Appellant said he told Linda that if it was to be a secret, she should keep it that way.

On the afternoon of February 26, just before closing time at 4:30 P.M., Miss Croft was talking to the whole group about her fiance going to ROTC summer camp at Fort Bragg and told them he planned to take airborne training after summer camp at Fort Benning, and according to testimony, nothing was mentioned about this award.

Mr. Dale Henry, a Civil Service employee of the Administrative portion of the ROTC Office in charge of handling all correspondence, routing it out, answering it and taking care of all student records and files, and Sergeant Michael McDowell, Mr. Henry's Assistant, both testified that they never received any mail from any authority relating to an award to be given Miss Croft's fiance, Cadet Whitlock.

The tendencies of the evidence clearly indicate that the question of an award originated in the mind of appellant.

Sergeant McDowell also testified that appellant had previously injured his back while he was getting ready to take their annual PT test and this was prior to February 26. The appellant also testified, on cross-examination, that he had injured his back sometime before February 26.

Linda Faye's fiance, Mike Whitlock came to Curtis Hall just before 7:00 P.M. to keep his date with Linda and was told that she was not there but was expected back shortly. He either telephoned or talked over the intercom at five to ten minute intervals trying to ascertain the whereabouts of Linda. She was reported missing and an intensive search was organized the next day by the Rescue Squad, Civil Defense Units, State and County Officers, Police Officers of the City of Jacksonville, Campus Police, fifty to sixty members of the ROTC Unit, several boys from the dormitories who volunteered to aid in the search, and two helicopters from Fort McClellan.

When her body was found, she did not have on any shoes nor was she wearing the beige coat, but they were both nearby. A silk scarf was tied through her mouth and knotted in the back.

Miss Croft's body was removed to a funeral home in Anniston, where an autopsy was made by the Toxicology Department for the State of Alabama, and the cause of death given as strangulation.

About 2:00 A.M. on Friday, February 27, two police officers went to appellant's home in search of information as to the whereabouts of Linda and observed pretty wide scratches on both of appellant's hands (top parts of each hand and wrist). Appellant told the officers his cat was in heat and had scratched him. Appellant was requested to go to Police Headquarters for further questioning and he and his wife followed the police car in one of his automobiles. Photographs of appellant's hands showing the scratch marks were taken at the Calhoun County Jail after arrest on Sunday afternoon, March 1, and were introduced in evidence at the trial.

On the morning of February 27, the appellant came to the ROTC Office in uniform and said he had been questioned by

the police and he was the number one suspect. He made a request to be released from duty for the remainder of the day so he could go and see legal counsel. This request was granted, and he left shortly after making the statement concerning an award that Linda had mentioned to him.

Lieutenant Harry Sims of the Investigation Division of the State of Alabama testified that he went to the scene where Miss Croft's body was found and made certain measurements. He testified that her body was lying nine feet and seven inches from the edge of Rocky Hollow Road and ten feet and five inches from the creek. Her beige coat and the blue shoes she was wearing when last seen alive were some few feet from the body. Photographs of these items were made at the time the body was discovered. Photographs of the scene were taken before the body was removed. They were properly identified and introduced into evidence without objection. A photograph of the face and upper part of her body was made and was introduced in evidence over the objections of appellant assigning grounds that the photograph was gruesome and would inflame the minds of the jury and prejudice them, and has no probative value.

Lieutenant Roy Riddle, Alabama State Investigator, identified the photographs and he also testified that he, Sheriff Snead, and Captain Davis, another State Investigator, went to appellant's home after lunchtime on Friday, February 27, and tried to talk to appellant, but appellant refused to talk to them.

Sheriff Snead asked him to turn over to him the clothing he had worn the previous day and he refused to do so. At that time, they observed scratches over both hands. Appellant told them he was getting his cat out of a tree and the cat scratched him. Appellant testified at the trial that his cat was in heat and got out of the house and climbed a pine tree. He got the cat out of the tree and carried her into the house. The cat jumped upon the bed and when ap-

pellant tried to remove the cat from the bed, the cat scratched him.

After appellant's arrest on a warrant signed by Sheriff Snead, he was taken to the Calhoun County Jail and was given a sheet, a towel, and a cup and was locked in Cell No. 3 by himself. This was the only sheet given the appellant and on the following Thursday, this sheet was removed, folded and put into a paper bag and turned over to Sheriff Roy Snead. The beige coat and pair of shoes were delivered by the Sheriff to the Toxicologist at the funeral home in Anniston. The trousers and shirt worn by appellant on the day Linda was last seen were turned over to the Sheriff in the alley at the County Jail by appellant's counsel on Sunday, March 1, and were delivered to the Toxicologist at the funeral home on Sunday night. The chain necklace worn by deceased was turned over to the Sheriff on March 1 and he carried it along with the sheet from appellant's cell to Birmingham on March 5 and delivered them to the Toxicologist. On this occasion, the Toxicologist gave the Sheriff a blue silk scarf that had been tied through the mouth of deceased and knotted in the back and is the same scarf that is shown in State's Exhibit No. 10, which is a photograph of the face and upper part of Linda Faye's body.

Doctor Robert Johnson, a Toxicologist with the State Department of Toxicology and Criminal Investigation, testified for the State as to his education, qualifications, and experience. He stated that he received his B.S. in Chemistry from Birmingham Southern College. He did approximately a year's postgraduate work in Ohio in Physiological Chemistry; had approximately two and one-half years' postgraduate work at the Medical College, University of Alabama in Bio-Chemistry; received a Master's Degree in Bio-Chemistry from the Medical College; and thereafter did approximately one to one and one-half years' postgraduate work at the Medical College in Bio-Chemistry; and had been with the State as a Toxicologist a little

over fifteen years. During this time, he has done something over eleven hundred post mortem examinations.

He stated that he first saw the body of this young woman on March 1, just after noon, at the Gray-Brown Service Funeral Home in Anniston and he measured her height at five feet five and one-half inches and estimated her weight at one hundred and ten pounds. He stated that at the time he first examined her,

"She was clothed in a navy blue vest-type jacket, with slacks to match. She had on a white blouse, a bra, panties, and panty hose, no shoes, and no coat. It was a blue kerchief tied through her mouth and around behind her neck, with a gold chain around the neck. There was a wrist watch on her left wrist and a diamond ring on the left ring finger."

At the trial, he identified the blue kerchief or scarf as the one he cut and removed from the mouth and around the neck of the body, and that he turned the scarf over to Sheriff Snead. He identified the shirt or blouse that he removed from the body at the time of the examination as well as the blue wool slacks and blue vest-type garment, all that he had removed from her body and had possession of the same since March 1, and they were substantially in the same condition as they were when he removed them from her body. He identified the blue shoes that had likewise been in his possession and stated that they were in the same condition except for the powder he had placed on them in an effort to lift fingerprints, but was unable to lift any prints.

He testified he also removed her underclothes at the time of post mortem and had them in his possession since March 1, as well as the beige raincoat, which was turned over to him by Sheriff Snead at that time. All of these items of clothing were introduced into evidence. In addition to these items of clothing, he also identified the sheet that had been removed from the mattress of the cell occupied by the de-fendant as the one that had been turned over to him on March 5 by Sheriff Snead, that it had been in his possession since that time, as well as the green slacks and green plaid or checked shirt that belonged to appellant which had been turned over to him by Sheriff Snead on the afternoon of March 1 at the Calhoun County Court-house. These items too were introduced into evidence after testimony that they had been in Johnson's possession and appeared to be in the same condition as they were when they were turned over to him. Appellant strenuously objected to the introduction of these items.

The Toxicologist further testified that after the removal of the clothing from the body of Miss Croft, he conducted a visual examination before performing the autopsy. He found some twenty-five to thirty small lacerations approximately one-eighth of an inch in diameter. They were not round but roughly that size and located across the middle forehead and down through the right side of the face. These were superficial in nature meaning they were only skin deep. In his opinion, they were post mortem in nature and did not occur before death. In Dr. Johnson's opinion they were made by ants and had nothing to do with the death. He stated that he found a one-quarter inch superficial laceration at the corner of the right eye, the outside corner; a quarter-inch diameter superficial laceration on the left cheek; the left eye to be blackened, that is bruised, which seemed to extend into the eyeball itself and a rather mild bruise in the eyeball. There were superficial lacerations on the lips, particularly the lower lip. They were approximately an eighth to a quarter of an inch wide and about three-eighths of an inch long. These lacerations were suggestive of the subject having bit her lip. There were three three-eighths inch diameter mild bruises on the left chin at the left corner of the mouth. There was a three-eighths inch wide laceration and indentation extending through the middle of the neck, approximately three-quar-

ters way around the subject's neck. The indentation probably was post mortem. Laceration is just a very faint tearing or scratching of the skin, according to Dr. Johnson. The left wrist showed five one-quarter inch mild bruises, starting at the base of the wrist and extending toward the inside aspect of it.

On the second knuckle, and on the third and fifth knuckles of the left hand, there were superficial lacerations that were approximately one-eighth inch in diameter. The fingernails on some of the fingers were broken, and some appeared to have been flexed so that they were bent or injured. On the right hand, the second fingernail was chipped, the third nail appeared to have been turned back rather severely and was damaged. The fingernail on the index finger of the right hand was chipped, roughened on one corner. The third nail had been turned back and there was a severely damaged area at the base of the nail where it attaches to the finger or the quick. There were some mildly damaged areas at the base of the fourth and fifth nails on the right hand where it attaches to the finger. They were only mildly bent. The first nail on the left hand had been slightly broken and slightly chipped.

Over the surface of the abdomen there were a group of eight to ten one-eighth inch lacerations, in groups. It was in an area approximately an inch long and three-eighths of an inch wide on the top right side of the abdomen (upper right-hand side of the abdomen, just below the ribcage). These were superficial and in his opinion anti-mortem. The Toxicologist found mild to moderate bruises in the organs of the neck, particularly in the thyroid gland. This was determined upon an internal examination during the autopsy. Based on the post mortem examination he conducted, he stated that it was his opinion that the cause of death resulted from strangulation.

The Toxicologist removed some material from under the fingernails of the deceased and examined it in the laboratory both chemically and microscopically and found traces of blood and Caucasian skin, that is the skin of a white person, but he did not have enough material to make a determination as to whose skin and blood it was.

The Toxicologist further testified that he observed the appellant in the Calhoun County Jail on March 1, 1970, and observed some superficial lacerations or scratches particularly about his hands and wrists. He stated that there were four three-eighths inch lacerations on the back of the left wrist and that there were three lacerations varying from one-fourth to three-eighths inches at the top of the outside aspect of the left forearm toward the elbow; and there were some seven one-eighth to three-eighths inch superficial lacerations on the back of the right wrist and one-quarter inch diameter superficial laceration on the inside palm of the right hand. He also testified that there were two one-quarter inch superficial lacerations at the base of each side aspect of the right thumb and one-eighth inch superficial lacerations at the second joint of each thumb. He said that the distance between these lacerations or scratches was approximately one-half to one inch.

The Toxicologist further testified that he examined the 1969 Plymouth Fury belonging to the appellant; and the car was essentially clean. He did note that the trunk was wet under the rubber mat. In the back seat of the car was a box of detergent and a light powdery stain on the back seat which appeared to be detergent.

He was asked to give his opinion as to how long the deceased had been dead prior to the post mortem examination, and he fixed the time at between sixty and seventy-two hours. The condition of the stomach indicated that she had eaten her last meal approximately three to four hours previous to her death.

The post mortem examination revealed that the deceased had some pneumonia, but most of the pneumonia was post mortem.

It was the type of pneumonia that results from fluid getting into the lungs. Saliva, stomach contents, a drink of water or any foreign liquid that gets into the air-way and into the lungs can result in pneumonia in a very short time. According to the Toxicologist, this type can result in thirty to forty minutes, and in this witness's opinion, deceased's death was the result of strangulation and not pneumonia.

Appellant objected to the testimony of the Toxicologist, Robert Johnson, as to the laboratory examinations and microscopic comparisons of the various hairs and lint fibers taken from the wearing apparel of both the deceased and appellant as well as the hairs that were found on the sheet in the Jail cell occupied solely by appellant, contending that this witness was not an expert and not qualified to render an opinion as to the similarity of the hairs and lint fibers. The trial court ruled that Johnson was an expert witness.

The Toxicologist testified that the green sport shirt belonging to the defendant and identified as State's Exhibit No. 20 was subjected to the laboratory examination and a few hairs, identified as human hairs, were found. He removed the hairs from the clothing, mounted them on a microscopic slide and made a microscopic examination and compared them with certain of the hairs that he had and he found them to be consistent with the hair from the defendant's own body. He further testified that from this particular shirt he found some lint fibers of several colors and composition. Some red lint fibers, some essentially white but with light bluish cast and some that were yellow and green in color, and some very pale blue to white.

This witness testified that he examined the sheet described as State's Exhibit No. 18 that had been in the cell of the defendant from Sunday until Thursday, and that he found some hairs on the sheet. He made an examination of these hairs and mounted them on a microscopic slide and conducted a microscopic examination of them and found some medium length hairs that were human hair. That upon a comparison of the hairs found on the defendant's shirt and the sheet by this microscopic examination, he determined them to be body hairs similar in color, shade, and in all visible respects. This witness further testified that he made a laboratory examination of the pair of trousers being identified as State's Exhibit No. 19, and the trousers belonging to the defendant and he found hairs on these and also some fiber. He compared these hairs with the hairs from the sheet and they were similar.

The Toxicologist was asked if in his experience in the practice of his profession that he from time to time examined cat hairs and he answered in the affirmative. He was asked if there was a difference in cat hair and human hair. He testified there was a difference and said,

"There is several differences. Characteristically, cat hair is, of course, considerably finer than human hair. In most instances, the medula, or makeup, of the interior structure of the hair is considerably different. The human hair usually has a single channel, or medula, inside. The medula may be interrupted, characteristic of a particular individual; and cat hair usually has several channels of the medula inside the hair itself, which is apparent on microscopic examination; and the makeup microscopically is different."

On cross-examination, this witness testified as to the difference in human hair and animal hair as follows:

"The medula in human hair is the central canal that runs all the way through it to the tip of the hair. And hair that has color to it, it most often has pigment. It is a little channel, a little tube. Very often, or most often, in any hair that has color to it, it will be filled with a dark substance that carries the pigment. In the human hair, the canal itself is only about a quarter to a third the size of the outside diameter of the hair.

Sometimes it is quite variant; but seldom does it represent more than fifty per cent of the outside diameter of the hair. It is usually fairly solid; but with rough breaks, or interruptions, as we refer to it. Animal hair, on the other hand, usually has a highly interrupted medula; and instead of one single tube, it is usually made up of a number of tubes, two, three, four, up to eight or ten."

He further testified that he identified the other hair from appellant's trousers to be cat hairs, being six hairs in number. He also found some lint fibers on the defendant's slacks that were of several characters. One was a group of fibers that were red cotton fibers and the color itself had bluish cast to it. There was a second group of fibers that were bright yellow-green in color.

State's Exhibit No. 12, being the blouse or shirt-waist removed from the body of the deceased was subjected to a laboratory examination by the Toxicologist and was found to contain some stains and also some hair, including a short, dark, brown hair and four finer hairs. He took the hair that he removed from the garment, mounted them on a microscopic slide, and conducted a microscopic examination and comparison. The single short, dark, brown hair was identified as human body hair and the four finer hairs were identified as cat hair. He then compared the single short, dark, brown hair with the hairs removed from the sheet and testified as follows:

"Q. Now, then, when you made the comparison of the hair, that you said you found on the blouse, and the other hair you found on the sheet, what was the result of that comparison?

"A. These were found to be similar to the shorter hairs that I removed from the sheet, identified as human body hairs."

He further compared the four cat hairs he removed from the deceased's blouse with the cat hair found on the trousers of the defendant and testified as follows:

"Q. Now, Mr. Johnson, I ask you this question, did you compare the cat hairs found on the blouse of the deceased with the cat hairs that you testified you found on the trousers of the Defendant?

"A. Yes, sir, I did.

"Q. What was the result of your comparison?

"A. They were similar."

The Toxicologist made a laboratory examination of the blue vest, or jacket that he removed from the body of the deceased and found three groups of hairs. One group was made up of fine long blond hairs; the second group was made up of short type hairs, similar to cat hairs, and the third group was made up of relatively short, dark, brown body hair. The third group of hairs were compared with the shorter dark, brown hairs that were removed from the sheet. The Toxicologist testified as follows:

"Q. In your comparison of that hair that you found on this blue jacket, and the hair that you found on the sheet, what was the result of that comparison?

"A. They were similar to the shorter body hairs off of the sheet."

The second group of hairs removed from this garment, which were similar to cat hairs, were subjected to a microscopic examination and found to be cat hairs.

The pair of blue slacks that the Toxicologist removed from the body of the deceased was examined in the laboratory and two groups of hairs were found. A microscopic examination was conducted and one group was found to be cat hairs and the other group was human body hair. A comparison was made of the human body

hair removed from the blue slacks with the hairs removed from the sheet and were found to be similar to the shorter body hairs found on the sheet, they were dark brown in color. A microscopic examination and comparison was made of the cat hairs removed from the blue slacks of the deceased with the cat hairs removed from the trousers of the defendant and were found to be similar. A laboratory examination was made of the pair of blue shoes which belonged to the deceased and inside the left shoe were found two short fine hairs. These were examined microscopically and found to be cat hairs. A microscopic examination and comparison of the hairs found in the shoe with the hairs found on appellant's clothing revealed them to be similar.

He further testified that there is no way of pinpointing hair back to an individual at this time.

On the wool blue slacks were found four groups of fibers; one was bright yellow-green fiber; the second was a reddish blue, a red fiber with bluish cast to it, it was cotton; the third group was pale blue, almost white; and the fourth group was made up of blue and pink fibers. He made a microscopic examination and comparison of these fibers with the fibers on the clothing of appellant and found that some were similar and some were not. Specifically, he found the bright yellow-green fiber component was similar. The red fiber, which was a cotton fiber with a bluish cast, was found to be similar. The pink and blue fibers were not similar. As a matter of fact, these fibers were foreign to appellant's clothing and the clothing of the deceased and did not come from either of them.

Lieutenant Harry Sims with the Investigative Division of the State and one of the officers who visited the scene where the body was found was recalled as a witness for the State. He measured the distance from Martin Hall on the Jacksonville State University Campus to the place where the body was found by the speedometer of his car. He measured the distance by two routes. He left the parking lot at the rear of Martin Hall and traveled north approximately one mile, turned left on what is commonly known as the Roy Webb Road and went a distance of some three and two-tenths miles to Possum Trot Road and turned right onto Rocky Hollow Road and traveled three-tenths of a mile to the scene. The distance was five and eight-tenths miles. He drove his car at speeds ranging from thirty-five to sixty miles per hour and the time it took to cover this distance was almost exactly eight minutes. He returned from the scene by traveling south on Rocky Hollow Road for a little more than six-tenths of a mile, to the intersection of the Old Jacksonville to Piedmont Road, which is commonly called the Salem Church Road, then toward Jacksonville on this road to the intersection of Alabama Highway 21 and along Alabama 21 back to the rear of Martin Hall. The distance by this route was five and one-tenth miles and traveling from thirty-five to fifty-five miles per hour, the time involved was about the same as the other route, viz. eight minutes. This witness also measured the distance from appellant's house to Martin Hall by the speedometer of his car and the distance was three miles and traveling thirty to forty miles per hour, it took him five and one-half minutes to make the trip. The route involved in this trip was from appellant's house by the cotton mill at Jacksonville, across the west of the Campus onto Alabama 104, commonly called the Crystal Springs Road, and eastward to the rear of Martin Hall. The distance from appellant's home to Martin Hall was measured by another route. He traveled from his home to Alabama 21, then turned northward by Jacksonville Square on Alabama 21 to Martin Hall. The distance was two and six-tenths miles. The rate of speed along this route was twenty-five to thirty-five miles per hour and traffic conditions were such that he had to stop several times. It took six and one-half minutes to complete this trip.

At the conclusion of this testimony, the State rested. The appellant moved to exclude the State's evidence on the grounds that a prima facie case had not been made; the State failed to prove each and every material allegation of the indictment; the State failed to prove any connection between appellant and the death of Miss Croft; and failed to prove the corpus delicti, as connected with appellant. The motion was overruled and an exception was reserved.

After a recess of ten minutes, appellant also moved to exclude each and every State Exhibit. The grounds assigned include the following: The same grounds stated in the motion to exclude the State's evidence with the added grounds that the Exhibits were not properly identified, or authenticated, no proper predicate laid for their introduction, not shown how the articles were taken, how they were preserved, nor how they were kept in custody with the chain unbroken as to the events of taking, preservation, and custody. These motions were overruled and exceptions reserved.

Appellant's defense was an alibi in addition to his not guilty plea. Mr. R. R. Reaves, appellant's next door neighbor testified that he recalled seeing appellant on the afternoon of February 26 about 4:30 when he drove by witness's house to his home. Mr. Reaves was in his garden pulling up okra stalks and appellant waved to him, and he threw up a stalk in waving back. Around 5:00, Mr. Reaves went in his house to see the "Lucy Show", which started at 5:00 and lasted thirty minutes, followed by the world and local news, the weather report, and the sports. He said he did not care for sports, and he went out of the house at 5:45 and heard appellant calling his cat and saw him get the cat out of a tree and carry it in the house. He did not hear appellant's car leave at anytime and did not see him again until the next afternoon when appellant came to him and asked him if he remembered seeing him when he came home the day before and he told the appellant he did.

Sergeant and Mrs. Lester Estep testified for the defense. The Sergeant was connected with the ROTC Unit at Jacksonville University and worked in the same building with appellant and would see him five to six times a day. They became good friends and appellant and his wife and Estep and his wife were frequent visitors in each others' homes. Estep said he saw appellant during the day of February 26 and they discussed appellant coming over to visit him that night. Appellant said he would be over between 6:30 and 7:00. Mrs. Estep got a telephone call from appellant at 6:30 stating he would be there at 7:00. Their homes are a mile and a half apart. When appellant arrived he was wearing a green sport shirt and green slacks. He was shown State's Exhibits 19 and 20 and identified the shirt and the slacks. They had coffee, talked and looked at television and appellant had been there awhile before he told them he had gotten his cat out of a tree and it scratched him. Mrs. Estep testified substantially the same as her husband, but her recollection was that appellant was wearing an olive green plaid sport shirt and dark gray trousers. She further testified that appellant called his wife, who had taken a job six days previously at a cafe, and told her to stop by the Estep home when she got off work. Mrs. Harnage came about 8:30 and they left around 9:15 P.M.

Appellant testified in his own behalf. He stated that he was born in Florida and raised in Jacksonville, North Carolina, where he finished grade and highschool. He graduated from Atlantic Christian College, a small liberal arts college in Wilson, North Carolina, after which he taught tenth-grade English at Jacksonville Senior Highschool. He entered the U.S. Army in 1967 and after various assignments in the United States, he stayed one year in Viet Nam. After his tour of duty in Viet Nam, he was assigned to Fort Gordon, Georgia. He asked to be assigned to the ROTC Unit

at Fort McClellan with duty at Jacksonville State University, Jacksonville, Alabama, and was actually assigned on November 7, 1969.

On November 7th, he met Linda Faye Croft and the other personnel who worked in the office. His working hours began at 7:30 A.M. and terminated at 4:30 P.M. Miss Croft worked for a period of time in the mornings, attended classes, and resumed work in the afternoons until 4:30 P.M. He saw her everyday during office hours but at no time out of the office except the day before she disappeared, when they both left the office at 4:30 and while driving in the same direction, he came up behind her at a red light. He honked his horn and she looked in the rear view mirror and smiled and waved to him. When the traffic signals changed she went in one direction and he in another, being the opposite direction.

He saw Miss Croft the next day at work. Between 2:30 and 3:30 in the afternoon of February 26, he had a private conversation with her. There were several people in the office at this time and, according to appellant, Linda Faye Croft leaned over his desk and in a very quiet whisper, said, "Floyd Harnage, if there were any kind of ROTC award, or any kind of a party for an ROTC award, wouldn't it be most likely that Colonel Wells would be present at the party, or at that award ceremony?" Appellant said he replied to her by saying that anytime he witnessed an Award Ceremony, or party for an award ceremony, that the Commanding Officer was always present. That Miss Croft then told him not to say anything to anybody about this conversation because it was supposed to be kept secret and he told her if it was supposed to be kept secret, and Mike wasn't supposed to know, then she should not be telling anybody about it.

Appellant further testified that he left the ROTC Building at 4:30 on the afternoon of February 26 and went straight home. He went to the mail box on the road and picked up the mail and stopped by the newspaper box, got the newspaper and went into the house. As he drove up he waved to Mr. Reaves, who lived in the house across the street. He changed clothes and put on a green plaid shirt and a green pair of trousers. He identified the trousers as State's Exhibit No. 19 and the shirt as Exhibit No. 20. According to his testimony, he then turned on the record player and straightened the livingroom and a side room, and after the lapse of fifteen to twenty minutes he got in his car and drove to the Dari-Delite across the street from the Post Office in Jacksonville and bought a coke and returned straight home. He said this trip couldn't have taken more than five or ten minutes and in his judgment he was back at his house shortly after five o'clock. He then sat down in the livingroom and read the newspaper after which he went in the kitchen and washed the dishes and cleaned the table as his wife was working at Lenlock Restaurant in Anniston.

Appellant further testified that he was standing in the front door of his home with the screen door open and his cat got out. He chased her around the house and she went up a tree. He got her out of the tree and carried her in the house. Later the cat got on the bed and he went in the bedroom to get her off the bed and the cat scratched him. He was shown State's Exhibits Nos. 6, 7, 8, and 9 and identified these photographs as the ones taken at the County Jail showing the scratch marks on both hands and wrists. He stated that earlier that day he had mentioned to Sergeant Estep about coming over to his house that night and that it was agreeable. He called at 6:30 and told Mrs. Estep that he would be at their home at 7:00 that evening. He then went in the bathroom and cleaned up and left for the Estep's home, arriving shortly after 7:00 and his wife came about 8:30 and they both left together at approximately 9:15 or 9:30 and returned home after stopping at a depository to drop some

books that Mrs. Estep had gotten from the Jacksonville Library.

Appellant testified that he was awakened that night around a quarter to 12:00 midnight when he got a telephone call from Major Jolley, who was one of the officers in his unit at Jacksonville State University and that at either 2:00 or 3:00 A.M. he was visited by two police officers from the University and they talked to him forty minutes to an hour. A short period later these same officers came back to his home and told him they had some questions to ask him out of the presence of his wife and he went with these officers to their car and had a conversation with them. These officers left and returned later and told him his Commanding Officer, Colonel Wells, and Chief Jackson of the University Police were at Jacksonville Police Department and wanted to talk to him. Appellant and his wife got in his automobile and followed the officers to Police Headquarters.

On direct examination, appellant was asked the following questions and gave the following answers:

"Q. Now, Floyd, you have testified that you saw Linda Faye Croft at approximately closing time, there at the office, on February 26, 1970. I will ask you did you ever see Miss Croft again after that time?

"A. No, sir, after I left that ROTC Building that afternoon, I have never seen Linda Faye Croft since that time.

"Q. I ask you, Floyd, did you kill Linda Faye Croft?

"A. No, sir, I never made any plans, nor have I carried out any plans, to kill Linda Faye Croft."

During the cross-examination of appellant, the District Attorney laid some impeaching questions to him as follows:

"Q. Now, I want to ask you this, please, sir, in that same conversation that you had with the officers about 2:00 o'clock on Friday, the 27th of February, if you said this or this in substance, 'I left work at 4:30 P.M. From there, I went west on West Francis Avenue; and drove straight home. I changed clothes, and drove back to Jacksonville, and drove up West Francis Avenue, and headed east, past the ROTC Building. I saw Sergeant Henry as I passed, and then I went to the Dari-Delite and drank a Coke.' Did you tell them that?

"A. To the best of my recollection, no, I did not tell them that, because I have no idea what direction is what in that city.

\*   \*   \*   \*   \*   \*

"Q. I ask you specifically, did you tell them in that same conversation, to the officers, after you said you went to the Dari-Delite and drank a Coke, 'I drove around the Square and headed south on Pelham Road; turned right on Alexandria Road, and came home, it was about 5:00 P.M. Then, I walked out to check my mailbox; and I saw Mr. Ginn, my next-door neighbor; and I waved to him.' Did you tell them that?

"A. I might have told them part of that.

"Q. What part might you have told; and what part might you have not told?

"A. As far as any directions, I never said any.

"Q. Forget the directions. 'It was about 5:00 P.M. Then, I walked out and checked the mailbox, I saw Mr. Ginn, my next-door neighbor, and waved to him.' Did you tell them that?

"A. I may have told them that I saw Mr. Ginn at 5:00 o'clock; yes, sir.

"Q. Did you tell them that you waved to him?

"A. I don't recall.

\* \* \* \* \* \*

"Q. Now, at the time when you were talking to the officers on that early morning, Friday morning, did you mention to them the name of Mr. Reaves at any time?

"A. I don't recall.

\* \* \* \* \* \*

"Q. Now, let me ask you this, do you recall any time, in talking with the officers, did you at any time mention the name of Mr. Reaves having seen you, or you having seen him?

"A. I do not recall what names I mentioned to those officers at that time; no sir.

"Q. On Friday afternoon, did you go to Mr. Reaves' house and remind him, or tell him, 'Do you remember seeing me yesterday afternoon?'

"A. In a way; yes, sir.

"Q. That was Friday afternoon, after you had been under some investigation; wasn't it?

"A. Yes, sir.

"Q. And then, it was after that that you told the officers, if you did tell them, about Mr. Reaves; isn't that correct?

"A. I do not know, sir.

\* \* \* \* \* \*

"Q. I was asking you about the conversation that you had with the officers, whom I have already named to you, about 2:00 o'clock in the morning; and I do not recall that we got the answer to that question. So, I want to ask you again this question; on that Friday morning, around 2:00 o'clock, in the presence of the officers, whom I have mentioned, I ask you if you made this statement to the officers, 'From 5:00 P.M. until 6:30 P.M., I read the paper, and also laid down to rest.'?

"A. I may have, yes, sir.

"Q. Well, do you deny making that statement?

"A. I don't recall."

"DON McWHORTER, called by the State for rebuttal testimony, having previously been sworn, was examined and testified, as follows:

"Q. You are the same Mr. Don McWhorter who testified previously in this case?

"A. Yes, sir.

"Q. Mr. McWhorter, on Friday, February the 27th, of this year, about 2:00 o'clock in the morning, did you, together with your brother Douglas McWhorter, and Officer Marcum, go to the defendant's home?

"A. Yes, sir.

"Q. Did you have a conversation with him at that time?

"A. Yes, sir.

"Q. Now, please, sir, listen to my question. At that time, in that conversation, I ask you if the defendant said this or this in substance, 'I left work at 4:30, at the ROTC Building; I drove straight home; I changed clothes, and drove back to Jacksonville. I drove up West Francis Avenue, headed east, and passed the ROTC Building. I saw Sergeant Henry as I passed; and I went to the Dari-Delite and drank a Coke.' Did he make that statement?

"A. Yes, sir.

"Q. I ask you if, at that time, in the conversation, if he made this state-

ment, From 5:00 P.M. until 6:30 P.M. I read the paper and also laid down to rest.'?

"A. Yes, sir.

"Q. In that same conversation, I ask you if Mr. Harnage said this or this in substance, 'That on Tuesday he followed, or drove up beside Linda Faye Croft at Little's Cleaners.'?

"A. At Little's Dry Cleaners; yes, sir."

On cross-examination this witness admitted that he did not recall or know what appellant said in regard to following Linda Faye Croft at Little's Dry Cleaners.

■ Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the defendant is thereby rendered admissible. Johnson v. State, 247 Ala. 271, 24 So.2d 17; Phillips v. State, 248 Ala. 510, 28 So. 2d 542; DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; McKee v. State, 33 Ala.App. 171, 31 So.2d 656.

■ We recognize the rule that one should not be convicted on mere suspicion, or for fear that he might have committed the act. The theory that he did so must be supported by legal evidence. We adhere to the oft repeated admonition that it is better that many guilty go unpunished than for one innocent man to be convicted.

There are, however, a number of incriminating circumstances reasonably calculated to connect the appellant as the guilty agent in the death of Linda Faye Croft. He was the last person known to have been with her at 5:35 P.M. on the day of her disappearance; they were seen walking toward the parking lot to the rear of Martin Hall and this lot was an eight minute drive from the Rocky Hollow Road where the body of Miss Croft was found the following Sunday; the mystery surrounding an award, an award ceremony or party, to be given Miss Croft's fiance that no one in the ROTC Office ever heard of until after her disappearance and then only from appellant saying the deceased told him about it; the letter that appellant is supposed to have shown Miss Croft to the effect that her fiance was to receive an award; the military Commander, Colonel Wells, had never heard anything about an award for Cadet Whitlock; the circumstances surrounding the statement and activities of Miss Croft that she was to meet a man whose last name began with an "H" at Martin Hall to learn from him where the award party was to be held; that if the man she was going to meet tried anything with her, she would give him a karate chop in the back as he had just returned from Viet Nam and had a bad back; other testimony in the record that appellant had a bad back, including his own testimony; the note found the next morning in Miss Croft's communications notebook in her own handwriting which shows she was experiencing grave doubts as to the bona fides of an award, or award party, and the fact that appellant went to his alibi witness, Mr. Reaves, on Friday afternoon to refresh his recollection that he saw appellant when he came home Thursday afternoon.

■ Any one of the above circumstances, when viewed isolationally, would be wholly insufficient upon which to hinge a conviction, but the totality of these incriminating circumstances, coupled with the expert testimony of the Toxicologist that he found traces of blood and Caucasian skin when he scraped under the fingernails of the deceased, and his testimony as to the laboratory examination and microscopic comparison of human hair, cat hair, and lint fiber, though inconclusive, required the submission of the case to the jury.

The Toxicologist testified that the science of hair investigation has not advanced to the stage of pinpointing hair back to an

individual at this time. We have not been cited to a case in Alabama, nor have we found one, dealing with hair identification. However, courts of last resort in many states have treated this subject.

The case of People v. Richardson, 25 Cal.App.2d 408, 77 P.2d 483, held human hair found on a tack in the defendant's car and a sample of hair from the deceased to be material and competent as to the identity of the driver of the car.

In People v. Abbott, 47 Cal.2d 362, 303 P.2d 730, the Supreme Court of California affirmed the death sentence of appellant for murder and kidnaping involving human hair and cloth fibers. The Court said,

"A search of Abbott's car led to the discovery of two hairs which were indistinguishable from Stephanie's (deceased) and six which were very similar to her hair. Eighteen fibers matching those in four of her garments were also found."
* * *

In White v. State, 52 Nev. 235, 285 P. 503, the Supreme Court of Nevada affirmed a homicide case inflicting the death penalty wherein human hair was made the subject of expert testimony. A hat belonging to deceased at the time of his disappearance was found in the woods and near the hat were several blood stains. Portions of these blood stains were tested by a witness who qualified as an expert. A human hair was discovered in one of these blood stains. This head hair was submitted for examination and comparison with a number of other hairs taken from the wearing apparel of the deceased found in his room shortly after his disappearance. An expert criminologist testified the hairs were identical—that these head hairs came from the same head. The Court said,

"The testimony of the witness Heinrich to the effect that certain hairs found on the clothing of Lavell (deceased) were identical to a hair found in one of the stains of blood near the powder house was properly admitted. The witness was shown to have special knowledge in this respect, and his opinion was based thereon. A sufficient foundation was laid for the assumption that the hairs found on Lavell's (deceased) clothing came from his head. The fact that there was room for doubt in this regard affected the weight rather than the competency of the opinion of the expert witness."

In People v. Carter, 48 Cal.2d 737, 312 P.2d 665, the Supreme Court of California had occasion to treat the admissibility of an expert's opinion relative to human hair. Deceased's wallet, a flex-handle wrench, and a red cap were found under a bridge at Edgar Slough, about two-tenths of a mile from defendant's house. On the day of the homicide, defendant was wearing a red cap. The Court wrote,

"Dr. Paul Kirk, a witness for the prosecution, testified that he examined the card room of the Log Cabin shortly after the homicide, and found that the grease on the floor was identical with the grease on the wrench discovered in Edgar Slough. He also testified that there was blood on the defendant's shoes and the lower part of his khaki trousers, and that the blood was type B, Carey's (deceased) type. He further testified that he found on the inside of the right rear pocket of the trousers another blood stain and two hairs that had a 'microscopic identity' with hair taken from Carey's head. Finally, he testified that one of eleven hairs found in the cap from Edgar Slough was 'morphologically indistinguishable' from one-fifth of a sample of defendant's hair."

In State v. Golladay, 78 Wash.2d 121, 470 P.2d 191, the Supreme Court of Washington held that an expert witness's use of the term "microscopically identical" in relation to pubic hair taken from defendant with hair combed from pubic area of raped-homicide victim was not prejudicial.

In State v. Wilson, 217 La. 470, 46 So.2d 738, affirmed by the Supreme Court of the United States, 95 L.Ed. 1341, the Supreme

Court of Louisiana held the microscopic examination and comparison of hair from the head of deceased with hair found on a stick to be competent and admissible. The Court said,

"[6] Bill of exception No. 6 was taken to the introduction of certain exhibits in evidence. These exhibits were a stick with blood on it found on adjoining premises; hair from the head of the deceased and her husband, who had been killed at the same time, used in making a microscopic examination in comparison with the hair found on the stick, etc.; a specimen of hair found on the stick and a specimen of hair found from the deceased's bed sheet. Counsel contends that these exhibits were not admissible in evidence because the chemist from the F.B.I. could not identify the hair as belonging to any particular person and could not identify the blood stains as blood coming from any particular person. The testimony of this laboratory expert was to the effect that the hair found on the stick was similar to the hair of the deceased and that the hair found on the bed sheet came from the body of a member of the Negro race. The objection goes to the weight and not to the admissibility of the evidence."

In the case of People v. Kirkwood, 17 Ill.2d 23, 160 N.E.2d 766, the Supreme Court of Illinois affirmed a rape conviction based upon laboratory finding of seminal stains, hair and feathers on sheet in complaining witness's apartment and on defendant's coat. The Court said,

"[10, 11] One further assignment of error remains. It is contended that the testimony of the police officer as to the laboratory findings of seminal stains, hair and feathers on the sheet and on defendant's coat was erroneously admitted. It is contended that such testimony was irrelevant and also that the officer should not have been permitted to express an opinion as to whether the hairs were from a white person or a colored person nor to testify that the material found on the sheet was similar to that found on defendant's coat. The relevancy of this evidence is so plain as to admit no argument. In support of defendant's second contention it is claimed that the similarity of the items was a matter within common knowledge and that the jury should have been permitted to draw their own conclusions as to their similarity. The record discloses that the officer's qualifications as an expert were admitted. He testified as to scientific tests on the material and to the results of a micro-analysis. On the basis of these tests, he expressed his opinion, without objection by defendant, that the hair and feathers on both articles were similar and that both the sheet and the coat contained traces of human semen. Defendant did object to the question of whether the hairs were from a white person or a colored person on the ground that there was no scientific basis for such a distinction. The witness then testified that there was some controversy by the authorities on the question, but that the witness's experience showed that such a distinction could be made. He was then permitted to answer the question and replied that in his opinion the hairs on both the sheet and the coat were from a white person. We believe that there was no error in permitting the witness to express his opinion on the question. The fact that there is a difference of opinion among the authorities goes to the weight of the evidence, rather than its admissibility."

In Acrey v. Commonwealth, 312 Ky. 732, 229 S.W.2d 748, the Court of Appeals of Kentucky held in a murder prosecution that the testimony by an F.B.I. expert that he examined hair beneath a comparison microscope, that the hair was human, and that the known hairs of decedent "were similar in all examinable characteristics to the other hair submitted," was competent and admissible even though such examination is not conclusive.

In Wright v. State, Tex.Cr.App., 422 S.W.2d 184, the Court of Criminal Appeals of Texas affirmed a first degree murder conviction with the assessment of the death penalty and held that fingerprints, hair color and texture, and dress evidence supported murder conviction and sustained the finding that the man found lying in park with multiple internal hemorrhages resulting from chest and abdominal injuries was the same man witnesses saw defendant kicking and stomping on in his room.

Appellant and deceased lived in separate but adjoining apartments in an apartment building. Deceased lived in Apartment No. 3 and appellant in Apartment No. 2. A sample of hair was taken from the body of deceased at the funeral home and put in an envelope, which envelope was then placed in the evidence box at the City Hall. Carl Maupin, chemist and toxicologist, who investigated rooms Nos. 2 and 3 in the apartment house in question testified as follows:

"A. Yes sir, I did. I compared the hair that I had taken out of the evidence box with the hair that I found on the floor.

"Q. Did you actually take this out of the evidence box yourself?

"A. Yes sir, I did.

"Q. You opened it and took it out, yourself?

"A. Yes sir; that's correct.

   \*   \*   \*   \*   \*   \*

"Q. All right. \* \* \* State what you did with the sample of hair, Mr. Maupin?

"A. I took the sample of hair, mounted it on a slide and examined it. And it was characteristic of human hair.

"Q. Did you compare it with any other hair?

"A. Yes, I compared it with hair from the deceased.

"Q. All right. \* \* \* And what is your opinion concerning that comparison?

"A. The comparison showed that the hair found in Room 2, was similar to the hair from the deceased, in color and in texture."

In Creel v. State, 42 Ala.App. 225, 159 So.2d 809, this Court in treating the question as to the qualifications of expert witnesses, said

"[2] The question as to whether a witness has by study, practice, experience or observation as to a particular subject, acquired knowledge beyond that of the ordinary witness, so as to qualify him to testify as an expert, is largely within the discretion of the trial judge, whose ruling thereon will not be disturbed on appeal unless a clear abuse of such discretion is shown. Alexander v. State, 37 Ala.App. 533, 71 So.2d 520; Willingham v. State, 261 Ala. 454, 74 So.2d 241; King v. State, 266 Ala. 232, 95 So.2d 816; Fiorella v. State, 41 Ala.App. 3, 142 So. 2d 885. We find no abuse of discretion here." \* \* \*

We hold there was no abuse of discretion in permitting the Toxicologist to testify. The weight to be accorded his testimony was for the jury.

Photographs of the scene showing the locale, body and wearing apparel of the deceased were introduced in evidence without objection. They appear in the record as State's Exhibits Nos. 1, 2, 3, and 4. Photographs of appellant's hands showing scratch marks identified as State's Exhibits Nos. 6, 7, 8, and 9 were also introduced in evidence without objection. Appellant objected to the introduction of State's Exhibit No. 10, which shows the face and upper part of the body of the deceased with a scarf through her mouth. The grounds of the objection interposed were as follows:

"We would like to object to the introduction of that photograph on the basis that the proper predicate has not been laid; it has not been properly authenti-

cated; not properly identified; and the photograph, in and of itself, would serve to inflame the minds of the jury. It is gruesome in nature and would be adverse to this case, and the rights of the parties involved. I see no material purpose whatsoever. It would tend to prejudice the jury. We add as further grounds of objection, that the picture, in and of itself, has no probative value."

■ Gruesomeness is not ground for excluding evidence consisting of photographs and clothing if it has a reasonable tendency to prove or disprove some material fact in issue, or which at the time appeared to be probably in dispute or material, and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. McKee v. State, 33 Ala.App. 171, 31 So.2d 656; Grissett v. State, 241 Ala. 343, 2 So.2d 399; Wilson v. State, 31 Ala.App. 21, 11 So.2d 563.

■ Sheriff Roy Snead testified that he took the left arm of deceased and turned her body up and looked at her face and teeth to identify her because he had a picture of her in his pocket. The scarf was tied in her mouth at that time. The scarf in this case was the murder weapon and tended to corroborate and elucidate the oral testimony regarding the cause of death. It was clearly admissible.

■ No error was committed in overruling and denying appellant's motion to exclude the State's evidence and all State Exhibits. As already seen, a great number of these photographs were admitted without objection. The clothing of the deceased and appellant were introduced in evidence over the strenuous objections of appellant.

■ It has long been the law in this State that the clothing of the deceased, as well as that of the accused, are admissible in homicide cases, when such objects tend to corroborate or disprove, illustrate or elucidate, any other evidence, or to identify any of the parties, or connect the accused with the crime, although such evidence may have a tendency to bias or prejudice the jury, and elicit their sympathy for, or animosity toward either the deceased or the accused. Campbell v. State, 23 Ala. 44; Teague v. State, 245 Ala. 339, 16 So. 2d 877; Barbour v. State, 262 Ala. 297, 78 So.2d 328.

The Court gave at the request of the defendant fifteen written charges and refused twelve others, including the affirmative charge. The evidence in this case made and presented a jury question. The affirmative charge was properly denied. The other refused charges were covered in the oral charge to the jury and in the given charges.

■ At the conclusion of the oral charge, the Court instructed the jury to retire and make up the verdict. The record reveals the following:

"(Whereupon, a juror stood.)

"JUROR: Your Honor, is it permissible for us to see the defendant's hands?

"THE COURT: See his hands?

"JUROR: Yes, sir.

"THE COURT: Not unless he wants you to, or his lawyers say that you can. Why don't you go upstairs and let me discuss this with the attorneys and I will call you back down, and I may have a little further charge for you."

After the jury left the courtroom, the Court said,

"Does either side want to take an exception?"

Whereupon appellant's counsel reserved an exception and moved for a mistrial because of the misconduct of the juror in putting appellant in an untenable position. The trial court overruled the motion for a mistrial and exceptions were reserved. The jury returned and Court gave the following additional charge:

"THE COURT: Gentlemen, I have considered your request and since the testimony, or evidence, has been closed and you have already received the

charge of the Court and the argument of counsel, it's my judgment that the request comes too late and is not proper. I am taking the responsibility of denying that request. You may retire and consider your verdict."

We hold the action of the trial judge in this matter to be reversible error.

Appellant, as above noted, took the witness stand in his own behalf. The District Attorney cross-examined him as to the scratches on his hands and wrists that he claimed were made by his cat on the same day the deceased was last seen alive, February 26, 1970. Appellant was on the witness stand on May 21, 1970, almost three months later. It was obvious during the cross-examination that appellant had difficulty in pointing out the location of the scratch marks. We can only speculate as to why this juror wanted a closer inspection of appellant's hands. We know the deceased died as a result of strangulation. This juror might have wanted to observe the muscular makeup or structure of appellant's hands and arms to satisfy himself that he could have easily strangled this girl, or for some other reason de hors the record.

 Conduct affecting one juror is in legal effect the same as if it had affected the entire jury and the test of vitiating influence upon the jury is not whether it did influence the jury to act, but whether it might have unlawfully influenced the jury in the verdict returned, as to its nature, character, or degree, or the amount and extent of the punishment fixed by the jury. Lawley v. State, 264 Ala. 283, 87 So.2d 433; Oliver v. State, 232 Ala. 5, 166 So. 615; Roan v. State, 225 Ala. 428, 143 So. 454.

It is true that the trial judge instructed the jury that he was taking the responsibility for not permitting them to inspect appellant's hands, but irreparable damage was done when the Court stated to the jury they could not inspect the defendant's hands

"(not) unless he wants you to, or his lawyers say you can."

In Thomas v. Ware, 44 Ala.App. 157, 204 So.2d 501, this Court said

"The entry of a mistrial is not lightly to be undertaken."

However, in cases where fundamental fairness dictates such course, there should be no hesitation to end the trial.

Because of the above-stated error, the case is due to be

Reversed and remanded.

PRICE, P. J., and ALMON and TYSON, JJ., concur.

CATES, J., concurs in part.

CATES, Judge (concurring).

I do not think that the State made out a prima facie case of any degree of homicide against Harnage. The main links in the concatenation are held together only by resort to speculation.