95 So.2d 816

John Wesley KING

v.

STATE of Alabama.

6 Div. 49.

Supreme Court of Alabama.

March 14, 1957.

Rehearing Denied June 20, 1957.

Rogers, Howard & Redden, Birmingham,
for appellant.

234

John Patterson, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for State.

STAKELY, Justice.

John Wesley King (appellant) was indicted for the offense of murder in the first degree. Trial was had on his plea of not guilty. The jury returned a verdict of guilty and fixed the punishment at imprisonment for life in the penitentiary. A motion for a new trial was overruled. The court sentenced the appellant accordingly and from such judgment and sentence this appeal has come to this court.

John Wesley King and the deceased, Jim King, were brothers. They were both bachelors and lived together in May 1955 and for several years prior thereto near the Hendricks Community about ten miles northeast of Oneonta in Blount County, Alabama. Their home was near the Little Warrior River. They lived alone. The deceased was about seventy-nine years of age.

One Clint Townley, according to his testimony, was an eye witness to the murder. Clint Townley testified that he had spent the night at the King home about a week before Jim King met his death. On the day of his death he went to the King home about one o'clock in the afternoon. Wes King was not there when he arrived but Jim King was. Wes King came in and Wes King and Clint Townley began drinking. Jim came in the room where they were drinking and began to remonstrate with Wes King about the drinking. Jim King then turned and picked up some fishing poles. "We could see him from the window there going down towards the river there, with them fishing poles."

Clint Townley further testified that after Jim King left Wes King said, " 'I'm going to have to do something or other. I'm going to put Jim in the asylum or do something or other with him. He is running me crazy the way he is doing.' " After a while Wes King said, " 'Let's go out and walk around. Does it suit you? and I told him yes, it suited me, and we'd get out and get a little exercise if it suited him." After a while Wes King said, " 'Let's walk down here where Jim went to on the creek and see if he is catching any fish. * * * I know there aint no fish down there. * * He aint catching no fish. Let's just go by where he's at down there.' I told him 'OK.' We walked on down there, walked to the creek and Jim was sitting there on the bank of the creek. So Wes asked him, 'Well, you catching a lot of these fish?' Jim got up and said, 'No, I aint caught no fish. * * * And Wes said, 'Well, don't you know if you weren't crazy you wouldn't be down here in this swift water a-trying to catch fish, knowing there aint none down here nohow.' "

"Well, Jim turned around and said, 'I just left the house to get away from that drunk mess and you followed me down here.' And Jim said, 'It's going to be

stopped, you staying drunk over here all the time, * * *.' So directly, Jim just turned around and walked back down there where his poles was at. I don't know whether he sat down. He either squatted down or sat down. * * * About the time he got squatted or sat down there, why, Wes just retched over there and got him a pole and hit him right across the head with it, and knocked him over there. And Jim he went to struggling and kicking. I thought he had killed him there. So he just took and run his hands in both of his pockets there and got a billfold out of Jim's pocket and put it in his pocket. Then he just got a-hold of him—it was right on the bank of the creek there—and he just rolled him over and pushing him in, in that swift water there."

The coroner testified that deceased had a fractured skull and other head and face injuries which caused his death.

The testimony on behalf of the appellant tended to show that the appellant was not at home at the time of his brother's death and that Clint Townley was seen by people in the community that afternoon. There was testimony that Townley left the community with money in his pocket and that his clothes were wet when he was seen leaving.

There was testimony tending to show the bad character of both the appellant and Clint Townley. A number of witnesses testified that they would not believe Townley on oath and there were other witnesses who testified they would not believe appellant on oath.

A searching party was formed by the people of the community on the night that the deceased failed to come home. His body was found in the stream a few feet from the bank near the spot where Townley testified that he was killed by the appellant. The clothes of Jim King were wet.

I. Before the jury returned its verdict the defendant made a motion to the court to withdraw the case from the jury and grant a mistrial. The ground assigned in support of the motion was that the jury had been separated during the trial of the case and after the testimony had all been taken. The court overruled the motion. The same proposition was raised by the appellant on his motion for a new trial, which the court overruled.

Testimony was taken by the court in connection with the separation of the jury. J. C. Carr testified that he was a Deputy Sheriff in Blount County and that he was acting as bailiff to the jury on the trial of the case and he was so acting the previous night when one of the jurors became sick. He contacted a doctor. The juror had had some medicine sent to him during the course of his service on the jury. The bailiff testified that he talked to the doctor and explained to him that Oris Martin, one of the jurors, was sick with a hemorrhage of the bowels. He further testified that the juror did not appear to be too sick. When he called the doctor the doctor called a doctor in Birmingham who advised that Oris Martin be carried to the hospital. Dr. Wittmeier was the local doctor and Dr. Lewis was the doctor in Birmingham. Sheriff Murray thereupon carried Oris Martin to the hospital. While Oris Martin was away the other jurors were kept together. Nobody talked to the other jurors or to Oris Martin. The hospital is about a mile or three-quarters of a mile from where the jurors were kept. Oris Martin spent the night at the hospital. J. C. Carr remained with the other jurors.

Roy Murray, the Sheriff, testified that he was informed the previous night that one of the jurors, Oris Martin, was sick and a doctor had ordered him carried to the hospital. Accordingly he carried Oris Martin to the Blount Memorial Hospital. At first there was difficulty in getting a bed for the patient. Finally, he spent the night in the emergency room. He, the sheriff, remained with the patient until a few minutes after midnight when he was relieved by Deputy Sheriff Shaviers. Dr. Wittmeier, the local doctor, was there and

some nurses were there and the sister of the patient came to the hospital and brought him a clean pair of pajamas. The sheriff testified that during that time nobody talked to Oris Martin nor was the case discussed. While his sister came to the hospital, she did not go into the room.

The Deputy Sheriff J. L. Shaviers testified that he was called to the Blount Memorial Hospital about twelve o'clock the previous night and he saw Sheriff Murray and Oris Martin and Oris Martin was in the emergency room, where he spent the night. That he was present at all times from five minutes after twelve until 7:30 in the morning, that he stayed awake at all times and that no one talked to Oris Martin about the case. In answer to questions by the court Shaviers testified that no one talked to Oris Martin other than the doctor and the nurse and that he was relieved in the hospital the next morning at 7:30 by the Sheriff.

Roy Murray, the Sheriff, further testified that he brought Oris Martin back to the court house, that nobody talked with Oris Martin about the case and that he had no contact with any outsider.

Oris Martin testified that from the time he became ill on the evening of the trial until the morning when he was returned to the court house he had no contact with anyone except the doctor and the nurse and except that he had been in the continuous custody of the sheriff or his deputy and that the case had not been mentioned in his presence or hearing by anyone.

The court read into the record a statement to the effect that it was made known to the court by the county solicitor about 6:30 or 7:00 o'clock of the juror's illness. The court suggested to the county solicitor that he contact one of the attorneys for the defendant and acquaint him with the situation of the juror's illness and obtain his reaction to the juror going to the hospital with an officer. Mr. Jack Martin Bains, one of the attorneys for the defendant, was contacted by the county solicitor and stated that insofar as he was concerned, he would have no objection. Mr. Bains further stated to the county solicitor that he was not speaking for Mr. Kelton, who was the Chief Counsel for the defendant, and suggested that the solicitor contact Mr. Kelton.

■ There is no doubt that in Alabama a separation of the jury after the trial has been entered upon and before verdict, creates a ground for reversible error in favor of the defendant unless the State affirmatively shows that the defendant was not thereby injuriously affected. In other words, the separation of the jury does not establish an absolute right to have a mistrial declared or a new trial granted but prejudice must result therefrom in order for a new trial to be granted. The right of the defendant in this respect is only prima facie and when a separation is shown, the burden is on the prosecution to establish affirmatively that the separating jury or juror conversed with no one as to the defendant's guilt and that no other influences were brought to bear on the jury or any of its members which might have biased their deliberations. Lynn v. State, 250 Ala. 384, 34 So.2d 602; Arnett v. State, 225 Ala. 8, 141 So. 699.

Miles v. State, 261 Ala. 670, 75 So.2d 479, is not a controlling authority in this case. In that case the sheriff, the deputy sheriff and the highway patrol officer were very active in the investigation of the case and as a result of their investigation the defendant was arrested and committed to jail. As a further result of their activity an alleged confession was obtained from the defendant when he was arrested. They caused the defendant to remove all his clothing and there was testimony that the defendant was beaten and otherwise mistreated. In that case the Court held that the case should be reversed since the sheriff, who was an important witness for the State in securing the conviction of the defendant, was in charge of the jury during the noon recess, took the jurors down town to a cafe and ate with them and was

in charge of the jury outside the presence of the court. Miles v. State, supra, strongly relies on Oliver v. State, 232 Ala. 5, 166 So. 615, wherein the coroner who had been active in investigating the case, procuring witnesses, causing the defendant's arrest testified to material facts and yet was permitted by the sheriff to have charge of the jury, sleeping and eating with them and remaining with them during much of their deliberation. The court held in that case that the State did not overcome the presumption of injury that entered into the verdict by reason of the presence of such witness.

■ In the case at bar neither the Deputy Sheriff J. C. Carr nor the Deputy Sheriff J. L. Shaviers testified, except on the motion for a mistrial and neither was shown by the evidence to have been active in the prosecution of the case. Roy Murray, the Sheriff, did testify in the case, but he took no part in the case until he joined in the search for Jim King around midnight of Thursday night, May 26th. He was present when the body of Jim King was discovered. He testified that he went to the place where the body was found with eight or ten men. Some were Hufstutlers, a Mr. Dorsey and some other fellows whose names he did not recall. When he first arrived at the river bank there were found a couple of fishing poles, a man's hat and on the river bank it looked as if something had slid into the water. There were marks and foot prints down the side and into the water. When the body of Jim King was found he was lying on his back on his left side, his head resting on some underbrush. There was no evidence or marks on the ground that water had been poured on his head. He was dressed in a shirt and overalls. He had on shoes. He had wounds on his head and a wound on his throat and some blood was observed running down on his face from the wound on his head. The body was stiff. He did not touch the body nor did anybody in his presence move the body. When the body was found he left some men there with the body and went to

his car and radioed Gadsden and asked them to call Oneonta and send the coroner and an ambulance to the scene. In about forty minutes to an hour Coroner LeCroy arrived. The coroner made an examination of the body. He found some smoking tobacco and a pipe. He didn't recall that he found anything else on the body.

John Wesley King, the defendant, went down to the river bank with the sheriff, where there were several other men. The sheriff testified that when he drove up to the house, John Wesley King said, "I want you to find my brother. He is on the river; been knocked in the head." The sheriff further testified, "I walked with him from the house to the river bank. He said in substance, 'I want you to help me find my brother. I believe he is on the river bank knocked in the head * * * I am afraid he is killed.'" The place where the body was found is about 190 yards from the house. The body was as close to the house as it could be and still be on the river bank.

The sheriff further testified that he learned that someone else had been down toward the King house. It was Clint Townley. On Friday morning after the body was found the sheriff testified that he went to check on Clint Townley's movements and to find out all he could about him. His sister, Mrs. Eudora Price, on his request gave him the clothes that Clint Townley had on when he came in the evening before. "I got those clothes around daylight. They were in normal condition just as if they had been pulled off the evening before. I brought those articles of clothing to the jail and later turned them over to Mr. Johnson, the State Toxicologist. The following Sunday night I saw Clint Townley in the Blount County jail. He came to the jail voluntarily."

Berval Hufstutler was the person who first discovered the body. He just called out to the crowd, "He is on the bank of the river." Some of the men had flash lights and some pine torch lights. The sheriff testified that he was there at the time the men went into the river and probed the

hole. He did not go into the river. The water there was from knee deep up to chest deep and some of it higher. The body was in a "thickety place" and he did not know how he got there or who carried him in. The men found him while they were still in the water and while they were moving toward the bank.

The witnesses in the case, other than the sheriff, testified as to the search for Jim King and as to matters which occurred before the sheriff reached the place where the body of Jim King was found. Roy Murray, the Sheriff, testified as to what he saw and found when he arrived at the scene of the homicide and as to the foregoing statements which he stated were made to him by Wesley King. He further testified that the reputation of Wes King in the community was bad for drinking and causing trouble.

 Oris Martin testified that he had nothing to say to the sheriff or his deputies with reference to the case and that they said nothing to him. The proof shows no undue familiarity between the officers and the juror. In instances of this kind each case stands on its own facts. Bell v. State, 227 Ala. 254, 149 So. 687. The fact that the officer in charge of the jury testifies to important facts, does not always disqualify him from having charge of the jury. Harris v. State, 233 Ala. 196, 172 So. 347.

The court overruled the motion to grant a mistrial which had for its basis the separation of the jury. We think such a finding is justified by the evidence and should be upheld by this Court. Harris v. State, supra; Lynn v. State, 250 Ala. 384, 34 So.2d 602: Arnett v. State, 225 Ala. 8, 141 So. 699. We, accordingly, say that the court was not in error in refusing the motion for a mistrial and in refusing the motion for a new trial on the ground that Oris Martin had become separated from the jury.

 II. It is argued that the coroner who examined the body of the deceased was not properly qualified as an expert to testify concerning the wounds found upon the body of the deceased. This witness stated that he was the Coroner of Blount County; that he did not have a degree; that he was a registered technologist with two years of college and one year under a pathologist; that in the course of his schooling he studied anatomy, hematology, parasitology; that he was a chemist for the blood bank; that he had worked in hospitals for ten years and that he had been present when an autopsy had been performed by employees of the State Department of Toxicology and has seen many dead bodies.

 Our cases hold that whether a witness is shown to possess requisite qualifications is a preliminary question largely within the discretion of the trial court. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Gettings v. State, 32 Ala.App. 644, 29 So.2d 677.

We find no error in the ruling of the court on the point here under discussion.

 III. It is insisted that the court was in error in refusing Charges 6, B and C. Charges B and C were substantially covered by the oral charge. Jackson v. State, 264 Ala. 528, 88 So.2d 206; Helms v. State, 254 Ala. 14, 47 So.2d 276. Charge 6 was substantially covered by given charge No. 7. Isom v. State, 37 Ala.App. 416, 69 So.2d 716. There was no error in regard to these matters.

 IV. It is further argued that the Court was in error in refusing to give Charges 18, M. and Q. To sustain the action of the court in refusing these charges, it is enough to say that each of these charges is abstract. A study of the record convinces us that there was other evidence in the case tending to connect the defendant with the commission of the crime beside the testimony of Clint Townley. Abercrombie v. State, 33 Ala.App. 581, 36 So.2d 111, certiorari denied 250 Ala. 701, 36 So.2d 115; Wilson v. State, 34 Ala.App. 219, 39 So.2d

250, certiorari denied 251 Ala. 676, 39 So.2d 254.

We have already detailed the statements made to the Sheriff Roy Murray when the sheriff came to the home of Wes King to aid in the search for Jim King. Berval Hufstutler testified that while they were making a search for Jim King, Wes King said: " 'He was talking at the time that we might find him on the bank and that if Townley had been down there no telling what happened to him, that we were likely to find him beaten up on the bank, that there was no telling what if Townley had been there.' "

According to Auburn Hufstutler, who testified for the State, when they were making the search the night of the killing and before the sheriff arrived, Wes King said: " 'We might find his body beaten up down there on the river somewhere, needing first aid.' He made statements like that several times."

Tony Hamby testified that a week prior to the death of Jim King he was talking to Wes King. The Kings were in a law suit about the Whitehead Place. He asked Wes King how they come out and he said, " 'I come down and silenced Johnson's mouth' " and if he " 'could get his sick, crazy brother out of the way, he would get the Whitehead Place and the other, too.' "

Tony Hamby was in the searching party the night when Jim King disappeared. According to the testimony of Tony Hamby, Wes King said quite a few times that his brother was on the creek somewhere beaten and robbed. During this time Wes King got up and walked around a little bit and said: " 'I can't stand this. I don't know anybody that would suspicion me and think I had anything to do with it except my best friend Claud (Claud Hufstutler).' " He further testified that after the disappearance and killing of Jim King he had a conversation with Wes with reference to the money that was on Jim King. Wes King said, " 'He said he knew just exactly how much money Jim had on him but he never would tell.' Jim King usually carried money on his person. He said, 'We would go to Cullman and buy a mule and that he had the money to buy anything he wanted to make a crop on.' "

Mit Patterson testified that maybe a month after the death of Jim King he was talking to Wes King. He testified: "He shook hands with me. I said, 'How are you doing, Wes?' I said, 'Have they still got that thing in jail that done that?' and he said, 'Do you know him?' and I said, 'Yes', and he said, 'You might help me. I am getting up evidence. Weren't you down that way that day and seen him?' and I said, 'No.' He said, 'If you were you wouldn't care about getting on the stand and swearing to it?' and I said, 'Not a bit in the world.' Then he said, 'Wasn't you down that way looking at timber or someting like that and seen him and my brother digging fish bait?' and I said, 'No, Wes, I don't know anything about it.' "

Collins (Buddy) Sisson testified that on the Saturday after the death of Jim King and after the funeral Wes King came to him and asked him would he say he was down there that day fishing and seen Clint Townley down there and I just said, "No, I don't want nothing to do with that."

Grover Horton testified that he saw Wes King about the time of the funeral of Jim King and he asked Wes King how he was getting along and he said, "Just fine, all except I owe so much."

Roy Dorsey was on the searching party the night the search was made for Jim King. He heard Wes King say on more than one occasion that his brother was down on the river bank needing help. He said, " 'Somebody had made a foul play on his brother; and he was down on the river bank somewhere needing help and that he would like for somebody to get him.' " It was then that the party stopped and came back to get Sheriff Murray to go with the searching party.

Claud Hufstutler was in the searching party. He testified that Wes King came up

to him and said his brother Jim was missing and " 'he was satisfied that he had went off fishing and probably fell in the creek.' " "He told me that there was no use to walk down the road, that he was on the creek bank somewhere; that he had been robbed and hit in the head."

Monroe Thomas testified that he had a conversation with Wes King after the death of Jim King in about the middle of July. "He asked me once that if he did get capital punishment would I write a book on his life. He asked me in substance, 'What if I say you were the third party in on it?' I said that it was impossible because I could prove where I was and he said, 'What if I say you were the third party in on it?' and he then said if he did 'get capital punishment would I write a book on his life.' "

John Hufstutler testified that he was on the searching party that night Jim King disappeared. Wes King, among other things said, " 'He just wondered if anybody might accuse him of having anything to do with it.' "

Later on the witness took a trip to Hartley's. He talked with Wes King. He said some of the reports were that Clint would probably go out to California and no one would ever know what happened to cause Jim's death. The witness said, "I have known you and Clint a long time. I just couldn't believe it of Clint." I told him Clint would be caught and in jail before Sunday. He said, " 'What if Clint is brought back and says you killed Jim?' I said, 'I know Clint will not say it was I. I know Clint will not up and tell a lie that way.' He asked me if Clint would tell he had something to do with it, would the neighbors believe it was a falsehood or a lie. I told him, 'No, the neighbors are good and wouldn't believe no falsehood.' "

Afterwards the witness was asked, "After you told him they would get Clint in jail by Sunday night, did Wes King make this statement in substance: 'Do you reckon he will tell it?' "

Among other things Wes King testified that he was in debt to his brother and that was what he was talking about when he made the statement to Grover Horton which has been hereinabove referred to. He further testified, "If I needed money I would ask anybody besides my old 'pennyful' brother." Wes King further testified that his father and mother are dead; that he has three living sisters; that so far as he knew Jim King never made a will. There is testimony in the case that Jim King had money in the bank and owned the land known as the King Place.

J. E. Herring, a minister, testified that he conducted the funeral of Jim King. Wes King came up to view the remains of Jim King when the casket was opened. As he viewed the body of his brother, Wes King said, " 'Pastor Herring, he doesn't look like he is mad at me now.' "

According to the testimony of Wes King himself he was at his own home with his brother during the early afternoon preceding the night when his brother disappeared and the last time he saw his brother was when he left him digging fish bait.

We say again that there was evidence in the record tending to connect Wes King with the killing of his brother outside of the testimony of Clint Townley and the court was not in error in refusing Charges 18, M. and Q.

■ V. During the cross examination of the State's witness, Paul Robinson, he was asked questions concerning a discussion that he had with Wes King after the commission of the crime here involved. He denied that during the course of this conversation Wes King tried to collect some worthless checks that he had given the deceased. The witness was asked whether he recognized these two checks after the checks were presented to him. Upon ascertaining that these checks were signed by Paul Robinson and made payable to Paul Robinson, the court sustained a motion to exclude the testimony concerning the checks. It is insisted that the court was in

error in that the appellant was not allowed to lay a predicate for the impeachment of this witness because of the ruling. So far as we can ascertain, there was no effort made on the part of the appellant to impeach the statement of this witness concerning these checks. The trial court by its ruling merely prevented the appellant from introducing in detail testimony as to the original transaction between the witness and the deceased concerning these checks. This entire matter seems to us to be immaterial to this case and that there was no error in this ruling of the court.

We consider that the record is free of error and the judgment of the lower court is due to be affirmed.

Affirmed.

All the Justices concur.