283 So.2d 448

**Irma Dell SENN**

**v.**

**STATE.**

**4 Div. 212.**

Court of Criminal Appeals of Alabama.

June 29, 1973.

Rehearing Denied July 26, 1973.

John B. Crawley, Troy, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant was indicted for murder in the first degree, entered a plea of not guilty, and convicted of murder in the second degree, which was embraced in the indictment. The jury fixed her punishment at fifteen years imprisonment in the penitentiary. She was represented in nisi prius by employed counsel, partially paid, and here by the same counsel appointed by the court because of her indigency.

The victim of the homicide was Helen Wiggins whose body was found inundated in shallow water of a small lake or pond in a rural section of Pike County.

The sheriff was notified and responded thereto. He recognized the deceased as Helen Wiggins. The body was transported to a mortuary where a state toxicologist, declared competent by the trial court, performed an autopsy and determined therefrom, according to his testimony, that death was caused by shock and hemorrhage associated with multiple puncture wounds in the chest and that said wounds could have been caused by a knife.

The Sheriff of the County, after the findings of the toxicologist had been determined, activated an investigative search, aided by his Deputies Anderson and Taylor and a State Investigator, to find the assailant who committed the crime.

It appears from the evidence that the sheriff and one or more of the associated officers knew the defendant was an associate of the deceased. This knowledge prompted Deputy Sheriff Anderson to make an investigative telephone call to defendant on Sunday, November 14, 1971, about 1:30 P.M., to find out when she had last seen Helen Wiggins. This was the first investigative step. During this conversation Mrs. Senn told Deputy Anderson that she had taken Helen Wiggins home on

Friday afternoon, November 12, 1971. It was then that Deputy Anderson informed Mrs. Senn of the Wiggins' death.

Thereafter about 1:00 or 1:30 A.M., Monday morning, November 15, 1971, the Sheriff, Deputy Sheriffs Anderson and Taylor and State Investigator Grant, went to appellant's home in Brundidge to talk with her and try to get further information or clues leading to a discovery of the assailant. Mrs. Senn was not at home. The group then went back to the county jail in Troy, held a short conference, and left the jail for the purpose of going to the "George Bray house," also known as the "Christian Home," located in the Needmore community twenty or twenty-five miles from Brundidge, to find appellant and to seek further enlightenment with respect to the homicide and who did it. At that time, as we view the record, the eyes of the officers were not focused upon Mrs. Senn as a suspect but on her as one in possession of facts which might ripen into clues which, if followed, might lead to a suspect.

When the officers arrived at the so-called house of George Bray, one or more of them saw a Rambler automobile parked in the yard. They recognized the car as being one which appellant owned or had been driving. One of the officers knocked on the door of the residence. They then learned that appellant was in the room and in the bed with George Bray. A couple of other black men were in another room of the building. The officers arrived at the "George Bray house" between 2:00 and 3:00 A.M. on November 15, 1971.

Upon arrival, Investigator Grand shined his flashlight into the parked automobile belonging to appellant and observed a red piece of clothing in the rear seat. Officer Grant had previously been informed that Helen Wiggins had been last seen wearing a red blouse. On the car seat the officer saw some spots which appeared to be blood stains.

Sheriff Davis testified that he was the first person to look into the car, that he found a red looking sweater in the car, and that appellant had told Deputy Anderson that Helen Wiggins had been wearing a red looking sweater or blouse.

When appellant came to the door after the knock thereon, the sheriff told her he would like to talk with her. She put on some more clothing to repel the chilled atmosphere. Appellant went to Investigator Grant's car with the sheriff and Officer Grant. While they were talking, Deputies Anderson and Taylor were prowling in the yard routinely with a flashlight to see what they could find.

A witness for the State was Deputy Anderson who lived across the street from appellant whom he had known for a long period of time. He had on many occasions seen the Rambler automobile which was found in the yard. It appears from the evidence that Deputies Anderson and Grant talked with appellant routinely about the homicide while all three were in the Grant car.

In the course of the conversation one or more of the officers informed Mrs. Senn about finding the sweater in the car and of the seat stains which appeared to be blood. They told her that they desired to take the automobile to Troy to get the stains examined to determine if they were blood stains. It appears that appellant did not voice any objection to such procedure but readily agreed to go along with them. It appears further from the evidence that appellant went back into the house, where the officers were present, to get her purse. When they returned and were about to get into appellant's automobile appellant asked Deputy Anderson to drive, saying, "Harold, I am too nervous." The Deputy proceeded to drive.

We are not impressed from the evidence that appellant was coerced or unreasonably persuaded to go with the officers back to Troy or to take the car there, but from certain remarks she made to Deputy Anderson, according to Anderson's testimony, she was glad to get away from the house

and from George Bray and further that she did not want to make any statements in the presence or within the hearing of George Bray. She was perfectly agreeable to go with the officers and ride with Anderson in her automobile.

En route to Troy, while appellant and Deputy Anderson were talking about the death of Helen Wiggins, appellant said, without any solicitation or inducement on the part of Anderson, "Would you believe me if I was to tell you the truth?" Anderson replied, "Sure, I would believe it, I have no other right only to believe you." Then she said, "I did it myself."

Officer Anderson testified that during the conversation in which the above inculpatory statement was made, he told appellant he wanted to read her rights to her but he couldn't get to his pocketbook which held his *Miranda* card. (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694). Then, failing to get his *Miranda* card, he stated to her as best he could remember her rights. She replied, "I know my rights." He testified, "I told her as near as I could on the *Miranda* card the rights that she had; that she could remain silent, and anything she said could be used against her, and if she wasn't able to hire a lawyer, the court would appoint her one and anything she said could be used against her."

We wish to note here that the defendant at no time took the witness stand and denied any of the testimony adduced from State's witnesses who took the stand and testified when motions to suppress were heard and during the trial of the case on its merits.

The record does not indicate that on hearing the motions to suppress, over which two circuit judges presided, and at the trial of the cause on its merits, over which one circuit judge presided, there was any evidence which would support appellant's contention that she was coerced or over-pursuaded by Deputy Anderson to talk or make inculpatory statements. But on the other hand it appears that she was pleased to get away from Bray and wanted to talk and possibly confide her guilt to Officer Anderson who was known to her to be an officer of the law for a period of time.

We cannot accord any merit to appellant's contention that her statements to Officer Anderson were involuntary and were the product of some unlawful influence or persuasion on the part of Officer Anderson. They appeared to be voluntary. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433; Miranda v. Arizona, supra.

The appellant contends that the events surrounding the officers' trip to the "George Bray home" and the return trip of appellant to Troy amount to "custodial interrogation" as defined in *Miranda*, supra. The evidence of Officer Anderson, which is not disputed and if believed, shows that the initial admission was not even in response to questions. They were not at the jail and she was not then in custody, nor was she deprived of her freedom because it appears from the uncontradicted evidence, as noted above, that she was anxious to get away from the Bray home. According to the testimony of Officer Anderson she was not under arrest when they left the house. At that time appellant was being taken to her home in Brundidge with a stopover at Troy to make a telephone call. Truex v. State, 282 Ala. 191, 210 So.2d 424(2).

Deputy Anderson testified that when he reached the jail yard at Troy he advised her to tell the sheriff about what happened. She was escorted upstairs and there advised in detail of her *Miranda* rights. She read and signed Exhibit 8 which informed her of her rights. The exhibit in substance said those rights were: (1) the right to remain silent; (2) that her statements may be used against her; (3) the right to consult an attorney and have him present; (4) that if she was financially unable to employ an attorney one would be furnished by the court and she

could have him present when she made the statement; and (5) that if she requested an attorney, no questions would be asked her until the attorney was present.

After signing Exhibit 8, supra, she then signed Exhibit 9 which Officer Grant wrote and read to her and which she also read, according to Grant's testimony, before signing. Exhibit 9 gave details leading up to the homicide and afterwards along with her confession that she killed Helen Wiggins.

Later, on Monday afternoon, soon after dark, on the same day that she signed Exhibits 8 and 9, in the presence of Deputy Sheriff Anderson, who was put up as a witness for appellant after he had already been on the witness stand for the State, she signed another statement in detail wherein she accused George Bray of killing Helen Wiggins and which in effect repudiated her participation as set forth in Exhibit 9. This statement, Defendant's Exhibit 2, went before the jury without objection on the part of the State. So the jury had before it these two exhibits, one of which said she killed Helen Wiggins and the other accused Bray of being the one who committed the homicide.

The fact that appellant called upon Deputy Anderson to witness Exhibit 2 indicates that appellant was friendly with him and that he had not been hostile or accusatory towards her when they were making the trip from the Needmore community to Troy, at which time it appears she talked freely and without restraint, minus physical or mental coercion or any inducement.

We again note that appellant did not take the witness stand to deny or affirm the State's evidence, some areas of which were contradictory. The evidence on the whole impressed the trial court that the six motions to suppress evidence were without merit; also the evidence impressed the jury, to the degree required by law, that appellant was guilty of murder in the second degree.

Little purpose would be served by an extensive summation of the record in the circuit court proceedings and of the evidence adduced when the motions were heard and trial was had on the merits of the case. The record is quite voluminous. Suffice it to say that two able and conscientious circuit judges participated in hearing the motions to suppress; only one presided at the trial of the case on its merits. They heard the evidence, all of which was orally adduced.

It is our opinion and holding that the denials of the several motions to suppress were correct, and that the trial of the case from beginning to end was free of prejudicial error. The record fails to set forth any grounds that would justify this court in reversing the judgment and remanding the cause.

### ON THE MOTION FOR A NEW TRIAL

■ The motion for a new trial as here presented and argued raised the point that appellant was entitled to a new trial because the nisi prius jurors were allowed to separate. This separation was only to the extent that one juror, Mr. James B. Lee, was escorted by the sheriff to the latter's office and there permitted, while the sheriff was standing by, to telephone a hospital in Enterprise to find out about the condition of his mother who was sick and confined in the hospital. The other jurors were kept together, both men and women, in charge of their respective bailiffs. The evidence amply shows that juror Lee did not discuss the case with any outsider, nor did the other jurors engage in such discussion. The evidence on the motion was quite extensive but, when considered in its entirety, it reflects that none of the jurors had any contacts or discussions with outsiders about the case.

We think the State met its burden to overcome any presumption of injury to appellant by reason of such separation. The evidence was ample to sustain the State's position that appellant was not prejudiced

from the separation. There was no evidence that Mr. Lee conversed with anyone about defendant's guilt, but on the other hand the evidence is quite clear and undisputed that Mr. Lee did not discuss the case with any outsider, nor did the remaining jurors carry on any such discussion. No unlawful influences were brought to bear on the jury which might have biased their deliberations. King v. State, 266 Ala. 232, 95 So.2d 816(1).

The court denied the motions for a new trial. This ruling, as well as the other rulings, including those that denied the several motions to suppress evidence, were all free of error. We think that appellant received a fair trial on all issues raised by the pleadings and that the two circuit judges, both excellent judicial officers, accorded appellant every lawful opportunity to present her case and refute the evidence adduced by the State.

The attorney for the defendant, both at the nisi prius trials (on the motions and merits) and here, has been very diligent and exhaustive in his efforts to represent the defendant and insure her protection as provided by law.

The judgment of conviction is hereby Affirmed.

All the Judges concur.