LEIGH M. CLARK, Retired Circuit Judge.
A jury found appellant guilty of murder in the first degree of Rose Dover Johnson and fixed her punishment at imprisonment for life, the only punishment the law prescribes for such crime. She was sentenced accordingly.
The evidence shows conclusively that one Alton Wilson, the recently divorced husband of defendant, was killed during the same incident that resulted in the death of Rose Dover Johnson. In the testimony in general, the middle name of the victim was omitted, and we will do likewise. As she was the only victim alleged in the indictment, we will endeavor in our references hereinafter to the victim to limit them to Rose Johnson.
An issue presented by appellant is whether the trial court erred “in failing to grant the defendant’s motion for a new trial based on the grounds that the overwhelming weight of evidence was against the jury verdict.” In arguing this issue, appellant limits consideration to the question of defendant’s alleged insanity as presented by her plea of not guilty by reason of insanity in addition to her plea of not guilty, which included the defense of self-defense.
A large part of the testimony presented by both parties was devoted to the matter of the mental condition and related problems of defendant. Undoubtedly she had had a hard life, physically, mentally, and economically. According to the undisputed evidence, her mother passed away when she was eight years old; her father married about eight months thereafter; she then lived with her stepmother for about a year until treatment by her stepmother became unbearable. She lived with her stepmother’s sister until she was thirteen, then she married and had four children by a profligate drunkard and wife-beater for her husband. She divorced him in October of 1959 and married Alton Wilson (the other person that was killed in the same incident that resulted in the death of the victim alleged in the indictment). Their married life consisted of one calamity after another. She said that she loved him in spite of her repeated charges of recurring periods of infidelity. A divorce was obtained a short time before the alleged crime, but she said that they had attempted a reconciliation and had again engaged in conjugal embraces in anticipation of a resumption of the marital status. During this time, according to her testimony, Rose Johnson became an obstacle. She testified that she learned that Rose had been illicitly intimate with Alton, that she was pleading with Alton to desist from that relationship. She testified also that she- had discussed the matter with Rose, who was working at the Holiday Inn in Jasper, and pleaded with her not to interfere with the relationship between defendant and Alton.
Defendant further testified that on the day of the fatal incident, she went to the home of Rose to discuss with her the mentioned tripartite situation, which seemed to her to be further complicated by the claim by Alton that he was no longer involved with Rose. She had a pistol in her purse as she drove up at the home of Rose. Her testimony continued as follows:
*228 “So, I drove up there and Al’s car was there. I pulled into the driveway .
“Q. You said Al’s car was there and you pulled in the driveway. Then what happened?
“A. I tooted the horn a little bit and Al came over to the car and he said, ‘Ann, is something wrong?’ I said, ‘No, I thought you were supposed to be at the motel.’ I said, ‘You weren’t there.’ He said, ‘Go on back to the motel and I will be there in about fifteen minutes.’ By that time Rose was walking up to the car. She said, ‘Ann, get out. We’re fixing to have a barbecue.’ I said, ‘Who is going to have a barbecue?’ She said, ‘Me and Al.’ I said, ‘Just you and Al?’ She said, ‘Yes, everybody else has gone fishing and I’m baby sitting.’ She said, ‘Get out.’ I said, ‘Well, I didn’t intend to get out.’ I said, ‘Has Al been seeing you this past three weeks?’ She said, ‘Yeah.’ I said, ‘Well, I think we need to have that talk.’ I said, ‘I think I will get out.’ So, I got out and we walked up in front of the cars and I started telling her that Al had been using her, lying to her and lying to me and telling me he wasn’t seeing her. She told me, ‘Ann, I can’t believe he has been seeing you.’ She said, T see him every night.’ She said when she would get off work at the Holiday Inn she would go down to the motel and spend most of the night with him.
“Q. What motel?
“A. P. M. Motel in Carbon Hill.

“Q. Go ahead, after she said that what? After she had told you she had been going and spending part of the night with Al what did she say?
“A. I told her I had been seeing Al every Friday afternoon. And, that we had been spending the afternoon at the motel there. She said she didn’t believe me. I said, T didn’t see him yesterday because he had to work all day.’ I said, ‘He called me and told me he had to work.’ I said, ‘But, the Friday before that I had seen him.’

“My daughter had just told me that Al had been making passes at her when they would be left alone in the house. He was trying to get her to go to bed with him. I told Rose, I said, ‘Rose, you can’t trust Al. I understand you have a young daughter.’ I said, ‘You might come home some time and catch Al in the bed with your daughter.’ I said, ‘He is that kind of a guy.’ Al got violent. He jerked my purse. He like to have wrung my arm off. I believe there is pictures here for the fact that there was a bad bruised place .
“Q. Was there a bruise on your arm?
“A. Yes, he jerked my purse.
“Q. You say he jerked your purse?
“A. He jerked my purse and I run and I heard the gun fired two or three times. I run.
“Q. Where did you run?
“A. I run around behind the car and come up on the back side on the driver’s side. He come running this way.
“Q. Where were you going when you went around the car and come up on the back side?
“A. I was going to get to the door to get away from there because he was shooting at me. I thought he was shooting at me.
“Q. You heard a gun fire?
“A. Yes.
“Q. Was there a gun in your purse?
“A. Yes. He had took my purse away from me.
“Q. Was it in your purse when he jerked it?
“A. Yes, it was.
“Q. And, you started getting in the car. What happened?
“A. There was a little scuffle or hustle around there on who was going to get in the car. I got in the car and I don’t know if he stumbled and fell back on the car but anyway there was a jar on the door and my hand got caught in the door. He put his hands in through the window and said, ‘You ain’t going nowhere.’ He said, ‘I’m going to kill you.’ He started chok *229 ing me and everything started turning black. I reached to get something to defend myself and I don’t know how it happened. I never had my hand on no trigger or nothing and I come up with it and it went off.
“Q. What happened to A1 after it went off?
“A. He got hit.
“Q. All right. Did he fall there?
“A. Yes.
“Q. Where was Rose when that was going on?
“A. I didn’t see her any more til I .
“Q. Do you know where she was standing at that time?
“A. No.
“Q. Do you know whether you shot Rose or not?
“A. No, I didn’t.
“Q. Did you have your purse when you were running around the back of the car and coming up to the door?
“A. No, no, he had my purse. He took my purse away from me.
“Q. Do you know what happened after that? Did you stay there or leave there?
“A. I left.
“Q. As you left there do you know where Rose was?
“A. Yes. When I looked out I saw they were both on the ground.”
If the circumstances narrated above as a background to the fatal encounter were not enough to have tremendously upset defendant, we add that the undisputed evidence shows that she had been under treatment for diabetes, arteriosclerosis and neurosis and that she had contracted cancer of the uterus, had had a hysterectomy and surgery as to her gall bladder and a cataract operation.
Defendant presented considerable lay testimony of members of her family and others as to defendant’s mental as well as physical condition, some of it constituted strong evidence of insanity; some of it fell short of an establishment thereof.
Dr. T. Malcolm Blake testified that he had been treating defendant for several years. He said that she was mentally unsound when he saw her and that unsound mind and insanity are approximately the same thing. On the specific question as to her sanity, Dr. Blake’s testimony is summarized by appellant in brief as follows:
“Dr. Blake further testified that a person suffering from the problems that the defendant was suffering from, and being upset like she was, they might not know right from wrong, and if they did know right from wrong, then it might still be impossible for them to have made a conscious choice between the two, and they would not have been able to resist doing what they did.”
In rebuttal the State called Dr. V. Delane O’Rear, a practicing physician at Jasper. His testimony is summarized in appellant’s brief as follows:
“Dr. O’Rear testified that he graduated from Medical College in Birmingham, Alabama, in 1961, and that he was qualified and licensed to practice psychiatry in the State of Alabama. Dr. O’Rear examined the defendant and determined that in his opinion she was sane at the time of the alleged homicide.”
Notwithstanding the overwhelming weight of the evidence as to defendant’s mental problems and stress and the natural appeal for sympathy that it presents, it cannot be said that the overwhelming weight of the evidence was to the effect that defendant met the burden required of her as to a plea of not guilty by reason of insanity.
“Every person over 14 years of age charged with [a] crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury.” Code of Alabama 1975, § 15-16-2.
A verdict of guilty concludes the issue of insanity at the time of the commission of the offense unless a preponderance *230 of the evidence indicates palpable error. Orforda v. State, Ala.Cr.App., 339 So.2d 1038, cert. denied, 339 So.2d 1042 (Ala.1976).
Although no issue is raised by appellant as to the sufficiency of the evidence to show that defendant with premeditation and deliberation and with malice aforethought intentionally killed the alleged victim, it should be herein stated perhaps that the daughter-in-law of the alleged victim, who was living with her on the day of the alleged homicide, testified that she was there when defendant arrived and heard defendant tell the alleged victim that Alton had been guilty of a gross wrong and that the victim told defendant to go home and sober up, and she would talk with her when she sobered up. She further testified:
“Q. And, when you got to the front door did you have occasion to see Al and Rose?
“A. Yes.
“Q. And, the defendant?
“A. Yes.
“Q. Did you see a car out there?
“A. I saw hers.
“Q. O.K. Did you hear them say anything at that time? Either of them say anything?
“A. No. A1 just opened the door for her.
“Q. Opened the door for her. And, when A1 opened the door for her what did she do?
“A. She got in and he closed it.
“Q. And, then?
“A. Then he was reaching inside the car and that is when she shot him and he fell back out.
“Q. All right. What did Rose . Let me ask you this. When A1 was shot where was Rose, when A1 was shot?
“A. She was standing at the head of the car.
“Q. Standing at the head of the car. And, did you hear Rose say anything after the first shot was fired?
“A. She was running toward A1 saying, ‘AT or ‘Ouch.’

“Q. Did you hear any other shots?
“A. Yeah.
“Q. All together how many shots in your best judgment that you heard?
“A. It sounded like about five or six.
“Q. And, when you got back to the front door did you see the defendant, Ella Wilson?
“A. Yes, sir.
“Q. Where was she?
“A. She was backing up and then she turned around and was looking toward the house.
“Q. Were you able to see what she did then?
“A. She backed up and pulled straight out in the driveway.

“Q. After she left did you see Al and Rose again?
“A. Yeah. I went out and checked them.
“Q. You checked them. Did A1 appear to be alive or to be dead?
“A. He was breathing a little bit but he was already .
“Q. Did he say anything to you?
“A. No.
“Q. Did Rose appear to be alive or appear to be dead?
“A. She was dead.
“Q. Did you see any gun or any knife of any kind laying around Al?
“A. No.
“Q. Did you see any gun or any knife or any weapon of any kind laying around Rose Johnson?
“A. No.”
A neighbor of the alleged victim testified that shortly after she heard five rapid gunshots, defendant appeared at her door and told her that she had just shot and killed her husband and his girl friend. The defendant then made some telephone calls and afterwards talked with the witness and told her that she had gone to Rose’s home in search of her husband, who had told her to come back when she was sober. Defendant then told her that she pulled out her .38 and shot him and she also said that when she shot him, Rose Johnson said, “Oh, you shot *231 him,” and that “she would have shot them again if she had not run out of shells.”
On the morning of the second day of the trial, defendant moved for a mistrial on the ground that the two jury bailiffs, a man and a woman, both deputy sheriffs, had been sitting in the jury room with the jury at recesses. After hearing evidence to the effect that during such time there were no discussions in the jury room as to the case in any way, the court overruled defendant’s motion for a mistrial. Such action was proper. See, King v. State, 266 Ala. 232, 238, 95 So.2d 816 (1957) and cases there cited. Furthermore, the same matter was presented and considered on defendant’s motion for a new trial, at which time nothing was presented to indicate that there was any impropriety in the bailiffs’ talking with jurors while in the jury room as to matters without any relation whatever to the case being tried. Positive and undisputed testimony taken on the hearing on the motion for a new trial disclosed affirmatively that nothing improper occurred.
The insistence by appellant that the fact that bailiffs were also deputies of the sheriff and that other deputies of the sheriff were witnesses for the prosecution and that such fact had an influence upon the jury to the injury of defendant is based upon speculation only and is definitely refuted by the undisputed evidence.
At the beginning of the trial during which it was understood that the jury was to be sequestered, defendant moved that the jury not be sent to the Holiday Inn for their lodging, contending that as the alleged victim had been employed at the Holiday Inn there was danger of contact between the jurors and personnel of Holiday Inn that would be prejudicial to defendant. It appears that the trial court carefully considered the motion and took into consideration that on a previous trial of the defendant, in which there was a mistrial by reason of her having a heart attack during the trial, the jurors had stayed at another motel but had done so contrary to objections and persistent telephone calls by members of the families of the jurors, which had come to the attention of the trial court. In ruling against defendant on its motion, the trial court indicated that it had no real choice but to lodge the jury at the Holiday Inn, but gave strict precautions against any incident that could have involved any contact between personnel of the Inn and jurors. No jurors were permitted to eat at the restaurant at the Holiday Inn; all phone calls were to be screened by the bailiff and the jurors were not allowed to go in the motel lobby. The management was informed that no employee was to attempt to contact the jury. The question was again considered by the trial court on defendant’s motion for new trial, where it was shown that the jurors were placed in rooms which faced away from the restaurant and the major complex of the motel. We find no error and no injury to defendant in the action of the trial court as to providing that the jury should stay overnight at said motel.
In defendant’s motion for a new trial, there was a ground that the court erred in overruling a motion for a continuance on the ground that a material witness for defendant, who had been subpoenaed, was unable to attend court because of illness. It appears that the absent witness was a brother of defendant, who at the time of trial was ill in Florida. It was claimed by defendant that he would have been of great help to defendant in the trial of the case and that he would testify as to defendant’s insanity. Although the record as a whole is very vague as to any definite contribution the particular witness would have made to the defense of the case, it appears that the trial court duly considered the matter in its ruling on it against defendant. There is little, if anything, to indicate that his testimony would have added significantly to the testimony of other witnesses for defendant, including members of her family, one of whom was another brother of defendant who lived in Florida. It was not claimed that the absent witness was present at the time of the alleged homicide. It is claimed that he saw some finger marks on her neck when he visited her at the jail. The record *232 as a whole fails to show an abuse of the usual discretion vested in the trial court on a motion for a continuance.
The absence of any likelihood of prejudice of the jury toward defendant may well be reflected by the trial court’s summation on overruling defendant’s motion for a new trial:
“With regard to the preponderance of evidence of sanity, of course this I feel was very clearly presented, very clearly and ably presented by defense side and also by the State’s side. Very clearly presented and the jury determined it. It was not a matter that they could not find Mrs. Wilson not guilty by reason of insanity. I can tell you quite frankly I as the Judge was very sympathetic toward Mrs. Wilson, personally. But, the jury did not feel that way and I don’t feel that there are any legal grounds or mistakes that the Court has made that would merit granting a new trial.”
As a final contention appellant says that the trial court erred in refusing thirty written charges requested by defendant. No discussion is made as to them other than in bulk and this without reference to any particular proposition of law involved. We have considered the refused charges, along with the court’s oral charge and fourteen given charges requested by defendant, and conclude that each of the refused charges was either substantially covered by the oral charge, or one or more of the given written charges, or that it did not contain a correct principle of law applicable to the issues and evidence in the case. We have searched the record for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.